In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3577

ANTONIO D. JONES,

*Petitioner-Appellant,*

*v.*

JAMES BASINGER,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 2:09-cv-00052-RLY-WGH—**Richard L. Young**, *Chief Judge.*

ARGUED FEBRUARY 8, 2011—DECIDED MARCH 31, 2011

Before SYKES, TINDER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* In 2004, petitioner Antonio Jones was convicted in an Indiana state court for his involvement in a horrific robbery that culminated in four murders. At his trial, two police detectives testified in detail about an informant's double-hearsay statement accusing Jones as the leader of the robbery and murders. That testimony was allowed on the theory that it was offered not to show the truth of the informant's statement but for the purpose of showing the course of the police

investigation that led to Jones' arrest. A divided Indiana Court of Appeals affirmed Jones' conviction, and the state courts denied relief on post-conviction review. Jones petitioned for a writ of habeas corpus under 28 U.S.C. § 2254, alleging that this testimony violated his Sixth Amendment right to confront the witnesses against him. The district court denied the petition without reaching the merits of Jones' Sixth Amendment claim.

The trial record makes unmistakably clear that the informant's double-hearsay against Jones was in fact used as substantive evidence to prove Jones' guilt, in violation of his Sixth Amendment rights. The Indiana Court of Appeals' failure to recognize this fact was an unreasonable failure to apply the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), to this case. Accordingly, we reverse and remand with instructions to grant the petition.

I. *The Murders and the Trial*

Shortly after midnight on January 17, 2004, Ronyale Hearne arrived at Anthony McClendon's apartment in Gary, Indiana, to pick up her two-year-old son A.M. *Jones v. State*, No. 45A03-0407-CR-339, at 3 (Ind. App. June 30, 2005) (unpublished opinion) ("*Jones I*"). Inside, Hearne discovered that the apartment had been the site of a brutal home invasion that had left three of the apartment's occupants dead—McClendon, Jimmie Jones, and Laurice Jones. Young A.M. was alive but mortally wounded. Hearne rushed him to the hospital, but he died there of multiple gunshot wounds.

Two days later, law enforcement officers received a tip that James Parks, Lenzo Aaron, and petitioner Antonio Jones had killed A.M. and the others in the course of a robbery. The informant claimed to have received this information directly from Parks himself. Based on that tip, Gary police arrested Jones and charged him with four counts of murder.

A. *The Prosecution's Case*

When the case was tried, the prosecution's star witness was Lenzo Aaron, who testified pursuant to a plea agreement in which he admitted participating in the robbery and murders, but under which all murder charges against him were dropped. On the night of the murders, Aaron explained, he, Parks, and Jones were at a party when McClendon called to ask Jones for help in buying a quantity of cocaine for $6,000. According to Aaron, Jones needed that cash himself and decided to rob McClendon. Aaron and Parks agreed to help, expecting that they would receive equal shares of the proceeds.

According to Aaron, the three men then traveled to McClendon's apartment, where Jones knocked at the front door and asked to be let in. When someone answered, Jones rushed into the apartment, firing his weapon and demanding to know where the money was. Jones and Parks then went into the rear area of the apartment, where, still according to Aaron, they killed McClendon and Jimmie Jones. Afterwards, Aaron said, Parks demanded that he kill Laurice Jones, but Aaron claimed that he left

the apartment rather than hurt anyone. (Aaron insisted that, although he brought the AK-47 to McClendon's apartment, he never shot anybody the entire time he was there.) Laurice and A.M. were both still alive when Aaron last saw them. Aaron said he heard two final gunshots as he walked away from the apartment. The three men then went their separate ways. For his part in the crimes, Aaron claimed he received only $230.

Jones' defense vigorously challenged Aaron's credibility. In her opening statement, Jones' attorney noted that Aaron was the only witness who placed Jones at the scene of the crime. She asserted that Aaron did so only "in order to get the deal he got." "They have no evidence," the attorney claimed, "other than a man who made a tremendous deal. A tremendous deal to be able to sit here and tell you anything that they need him to say." As a parting shot at Aaron's credibility, Jones' attorney described Aaron as "someone who has a whole lot to lose," someone willing to say, " 'Oh, you want me to say [Jones] did it? Okay, [Jones] did it.' "

B.  *The Double-Hearsay Accusation—Jeffrey Lewis' Statement to Law Enforcement*

In an attempt to counter Jones' attack on the foundations of its case, the prosecution requested and received the trial court's permission to present testimony detailing the tip that had led to Jones' arrest. The prosecution argued that Jones had "opened the door" to such testimony by repeatedly implying that Aaron's testimony was the only evi-

dence of Jones' guilt. Tr. 590-93. Over Jones' objection, the court agreed to allow the prosecution to discuss the informant's tip, reasoning that "one implication of [Jones'] questioning could be that the police are all over God's creation looking for evidence and they found nothing to connect your client to this [crime]." Tr. 594. As a result, the court explained, it would allow testimony about the informant's tip "for the limited purpose of showing course of investigation, which takes it outside of the hearsay rule." *Id.*

The prosecution then questioned Gary police detectives Lorenzo Davis and Michael Jackson regarding the tip that initially led them to suspect Jones' involvement in the murders. Their extensive testimony went far beyond any arguably legitimate "course of investigation" use and provided a detailed but double-hearsay account of the crimes. The prosecution was even allowed to bolster the credibility of the non-testifying tipster, a point that would have been completely irrelevant if the tip were not being used to prove the truth of its contents.

According to Detective Jackson, a man had contacted police two days after the murders and claimed to have information about them. The man refused to identify himself or provide any information but said he would call back later. When the man called back the next day, he identified himself as Jeffrey Lewis and said that he wanted to talk about what had happened at McClendon's apartment.

Detective Jackson met with Lewis the next day, and Lewis told Jackson "who committed the [shooting], what

took place, the type of weapons that they used, and where all of these individuals were or lived." Specifically, Lewis claimed that his brother James Parks had confessed to Lewis that he, Aaron, and Jones had committed the four murders. According to Lewis, Parks had told him that the three men were at a party together before going to rob McClendon's apartment. Lewis also said that his brother had supposedly told him the motive for the robbery: Jones "needed the money to pay his rent."

Lewis also told the police that Parks had provided a number of specific details about the shootings. The men had gained entry into McClendon's apartment, Lewis said, by simply knocking and asking to be let in. Once inside, Lewis told the detectives, Jones declared that "they couldn't leave any witnesses," and Parks told Aaron to "finish off" Laurice Jones. Lewis also said that his brother had told him that Jones and the others had made off with "a large sum of money [from] the residence."

Lewis said the murder weapons were a .22-caliber handgun, a .45-caliber handgun, and an AK-47 assault rifle, and he provided descriptions of the .45-caliber and the AK-47. A man named Shawn Dixon had purchased the AK-47 for Parks, and Lewis had seen Jones with the .45-caliber "a lot of times." According to Lewis, Parks still had the AK-47, but the handguns had been discarded in a "swampy area" or waterway near Chase Street in Gary. This detailed and damning double-hearsay was allowed despite repeated objections by the defense, always on the theory that it was showing only the "course of the investigation" and responding to Jones' defense that the only (admissible)

evidence linking him to the crimes came from Aaron pursuant to his generous plea agreement.

Despite these objections, the trial court made no effective effort to caution the jury not to consider Lewis' statement for its truth, though such instructions should have been given if there were any merit to the rationale for allowing the testimony in the first place. The court never instructed the jury that Detective Davis' testimony about the Lewis statement could not be considered for the truth of its contents. During Detective Jackson's lengthy and detailed testimony about the Lewis statement, the court told the jury that responses to only three specific questions about the Lewis statement should not be considered for their truth.

In closing arguments, the prosecution further bolstered its case with the double-hearsay from Lewis. The prosecutor reminded the jury that it was Lewis' information that had initially caused the police to investigate Jones:

> They were already looking for Shawn Dixon and the AK-47 purchase. They were already going up and down . . . trying to find the guns that were thrown. And Lenzo Aaron was not arrested until January 26. They were already, already looking for three people. Three different guns and those three people were [Parks, Aaron, and Jones], long before Lenzo Aaron talked to the police.

Tr. 1898-99. In its rebuttal closing argument, the prosecution continued:

> You now know that Aaron is not the only reason that we've been here for the last two weeks. He is not. They

followed their investigation . . . the information that [they] received was to go after Aaron first, because Aaron is the weakest link. And that is just what they did. As far as some reward, [Lewis] never asked for it. He said from the beginning, it's not about the money. It's about the baby. That's what it's about.

Tr. 1954. Following closing arguments, the trial court issued its final jury instructions, none of which imposed any limits on treatment of the Lewis statement. The case then went to the jury, which convicted Jones on all four counts of murder. The trial court sentenced Jones to a total of 240 years in prison.

II. *Direct and Collateral Review*

On direct appeal from his conviction, Jones argued that the testimony about what Lewis told the detectives violated his Sixth Amendment right to confront the witnesses against him. A majority of the Indiana Court of Appeals rejected this claim. The majority acknowledged Jones' attempt to "establish that Aaron was the only source of evidence" against him and acknowledged that this attack may have "weakened the State's case since Aaron testified in the trial pursuant to the terms of a plea agreement." *Jones I*, No. 45A03-0407-CR-339, at 6-7. Although the majority admitted that the testimony about Lewis' statement "pointed toward [Jones'] guilt" and "had great prejudicial impact since it suggested that Jones committed the quadruple homicide," the majority said that the prosecution had to "introduce[ ] the police detectives' testimony to prove that there was a great deal of evidence

that was developed prior to [Aaron's] statement that was based upon evidence given to them by [Lewis]." *Id.* at 7 (quotation marks omitted). It was "necessary," the majority declared, "to explain to the jury why the police started investigating Jones because Jones sought to prove that Aaron, whose credibility was in question, was the only source of evidence against him." *Id.* at 9. Because "the testimony of the police detectives regarding [Lewis'] statement about his brother's confession was [proffered only] to show the course of police investigation . . . the testimony did not constitute hearsay, and [Jones'] right to confront the witnesses against him was not violated." *Id.* at 10-11. The Court of Appeals majority also said that admission of the Lewis statement was harmless because "the judge instructed the jury every time that the statement was only offered to prove the course of the police investigation and not the truth of the matter." *Id*. at 7.

In a dissenting opinion, Chief Judge Kirsch argued that "the purpose of the hearsay evidence was clearly to bolster the State's case against Jones, not to show the conduct of the police investigation." *Id.* at 17. "Jones' counsel made no comment about the police investigation," he pointed out, but merely "noted that the only evidence which the jury would hear would come from [Aaron], who had struck a favorable plea bargain with the State." *Id.* Given this fact, "the State's claim that the challenged evidence was being admitted for a purpose other than to prove the truth of the matter asserted strains credulity." *Id.* Judge Kirsch wrote that "the majority seems to say that because the admissible evidence against Jones was weak, and Jones' counsel noted such fact, it was proper to admit otherwise inadmissible

evidence." *Id.* at 16. Under that rationale, he feared, "any hearsay statement to police during the course of their investigation would be admissible whenever a defendant makes any comment on the evidence." *Id.* at 17.

The Indiana Supreme Court declined to hear the case, and Jones' conviction was later upheld on state collateral review. Having exhausted his state post-conviction remedies, Jones petitioned for a writ of habeas corpus in federal district court, again asserting that the introduction of Lewis' statement violated his Sixth Amendment rights. The district court disagreed, determining that the admissibility of Lewis' statement was merely an "issue of state evidentiary law," so that habeas relief could be granted only if that statement's admission violated either due process or the Sixth Amendment's Confrontation Clause. *Jones v. Finnan*, No. 09-cv-052, at 4 (S.D. Ind. Sept. 24, 2009), quoting *Johnson v. Bett*, 349 F.3d 1030, 1037 (7th Cir. 2003).

The district court did not reach the merits of Jones' Sixth Amendment claim, however. Rather, the district court framed the issue in terms of whether Lewis' statement violated Jones' right to due process of law. Even if a constitutional violation had occurred, the district court added, any error was harmless because the detectives' "'testimony was not the only testimony that pointed toward [Jones'] guilt'" and because "'the [trial] judge instructed the jury every time that [Lewis'] statement was only offered to prove the course of police investigation and not the truth of the matter asserted.'" *Id.* at 4, quoting *Jones I*, No. 45A03-0407-CR-339, at 7. As we will see, on this key point, both the state appellate court and the district

court erroneously described the trial record and applied the wrong legal standard.

After denying Jones' habeas petition, the district court also denied Jones' request for a certificate of appealability, see 28 U.S.C. § 2253(c)(1)(A), on the grounds that no reasonable jurist could disagree with its resolution of Jones' constitutional claims. The district court went on to say that Jones' appeal was "not taken in good faith" because there was "no objectively reasonable argument which [Jones] could present to argue that the disposition of [his petition] was erroneous." This court granted a certificate of appealability on the sole issue of whether the admission of out-of-court statements at trial violated Jones' Sixth Amendment right of confrontation.

III. *Appellate Jurisdiction and Standards of Review*

We have appellate jurisdiction over Jones' Sixth Amendment claim pursuant to our grant of a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A) (prohibiting appeals from final orders in habeas proceedings absent a certificate of appealability); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("[U]ntil a [certificate of appealability] has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners."). Our appellate jurisdiction extends only to the Sixth Amendment claim described in that certificate. See 28 U.S.C. § 2253(c)(3); *Rittenhouse v. Battles*, 263 F.3d 689, 693 (7th Cir. 2001) (noting that "a habeas petitioner may appeal only those issues for which a certificate of appealability has been granted").

We pause briefly to note the district court's error in denying a certificate of appealability in this case. The statute provides that a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has interpreted this language to require a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), following *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983).

When a state appellate court is divided on the merits of the constitutional question, issuance of a certificate of appealability should ordinarily be routine. A district court could deny a certificate of appealability on the issue that divided the state court only in the unlikely event that the views of the dissenting judge(s) are erroneous beyond any reasonable debate. See *Slack*, 529 U.S. at 484. That prospect is likely rare enough to call for some explanation in the order denying the certificate of appealability, an explanation that was lacking here.

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Jones must first show that "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); see *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (per curiam) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal

courts."). Second, Jones must also show that his detention
was the result of a state court decision (1) "contrary to, or
involv[ing] an unreasonable application of, clearly estab-
lished Federal law, as determined by the Supreme Court of
the United States;" or (2) "based on an unreasonable
determination of the facts in light of the evidence pre-
sented in the State court proceeding." 28 U.S.C. § 2254(d).

We review the district court's legal conclusions de novo.
*Milone v. Camp*, 22 F.3d 693, 698 (7th Cir. 1994). The district
court made no independent findings of fact (which would
have been reviewed for clear error, *Reeves v. Battles*,
272 F.3d 918, 920 (7th Cir. 2001)), so our review is limited
to the state courts' findings of fact, which are presumed
to be correct unless rebutted by clear and convincing
evidence. 28 U.S.C. § 2254(e)(1).

## IV.  *The Sixth Amendment Violation*

 The first issue we address on the merits is whether the
introduction of the double-hearsay statement by Lewis
violated Jones' Sixth Amendment right to confront wit-
nesses against him, as set forth by the Supreme Court in
*Crawford*. The record makes clear that Jones in fact suffered
repeated violations of his Sixth Amendment right to
confront Lewis and Parks.

The Confrontation Clause guarantees criminal defen-
dants the benefit of "the principal means by which the
believability of a witness and the truth of his testimony are
tested," *Davis v. Alaska*, 415 U.S. 308, 317 (1974)—subjecting
that testimony to "the crucible of cross-examination,"

*Crawford*, 541 U.S. at 61. In the American legal system, the role of cross-examination has paramount importance to a criminal trial's core truth-seeking function. See *California v. Green*, 399 U.S. 149, 158 (1970) (calling cross-examination "the greatest legal engine ever invented for the discovery of truth" (quotation omitted)). A rigorous cross-examination may bring to light a variety of reasons to doubt a witness's testimony, ranging from innocent failures in perceptions and memory to biases, prejudices, or ulterior motives, or outright inconsistencies and falsehoods. See *Davis*, 415 U.S. at 317. The Confrontation Clause also advances the pursuit of truth by "insur[ing] that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury," and by "permit[ting] the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *Green*, 399 U.S. at 158.

To ensure these benefits of cross-examination, the Sixth Amendment bars the admission of "testimonial hearsay" against a criminal defendant unless (1) the declarant was unavailable at trial; and (2) the defendant had a prior opportunity to cross-examine that declarant. *Crawford*, 541 U.S. at 68. Neither of these requirements was satisfied here. Lewis was clearly available—the prosecution had Lewis under subpoena but simply chose not to call him as a witness. (T. 1249, 1452). Jones never had a prior opportunity to cross-examine Lewis about his statement. See *id.* at 54 ("[T]he common law in 1791 conditioned admissibility of an absent witness's examination on unavailability

and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations."). Therefore, Jones' right to confrontation was violated if Lewis' statement (1) was testimonial; and (2) was hearsay. See *id.* at 68. It was both.

As to the first element, the State concedes with good reason that Lewis' statement was testimonial. *Crawford* declined to "spell out a comprehensive definition of 'testimonial,' " *id.*, but the term clearly pertains to statements made "in anticipation of or with an eye toward a criminal prosecution." *E.g.*, *United States v. Tolliver*, 454 F.3d 660, 665 (7th Cir. 2006); see *Davis v. Washington*, 547 U.S. 813, 822 (2006) (asking whether "primary purpose" of a statement was "to establish or prove past events potentially relevant to later criminal prosecutions"). Lewis' statement to the police, supposedly made for the purpose of helping bring to justice the people responsible for the murders in the McClendon home invasion, certainly qualifies as testimonial.

Lewis' statement was also hearsay—double-hearsay, to be precise, because the detectives testified about what Lewis claimed his brother Parks had told him—but this conclusion requires some explanation in light of the state courts' treatment of this evidence. The identical Indiana and federal evidentiary rules define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. R. Evid. 801(c);

Fed. R. Evid. 801(c).[1] Under this definition, "[w]hether a statement is hearsay . . . will most often hinge on the purpose for which it is offered." *E.g.*, *United States v. Linwood*, 142 F.3d 418, 425 (7th Cir. 1998). *Crawford* adopted this purpose-based definition of hearsay for the purposes of the Confrontation Clause. See 541 U.S. at 59 n.9 (noting that the Confrontation Clause does not apply to statements offered "for purposes other than establishing the truth of the matter asserted"); *United States v. York*, 572 F.3d 415, 427 (7th Cir. 2009) ("*Crawford* applies only to hearsay, which must be a statement offered for the truth of the matter asserted."), citing *Crawford*, 541 U.S. at 59 n.9.

The ultimate question, then, is whether the prosecution offered Lewis' statement for the purpose of establishing the truth of its contents. See *United States v. Mancillas*, 580 F.2d 1301, 1309 (7th Cir. 1978) ("Even if a tip with a direct charge of specific criminality cannot practically be [r]eceived in evidence only to prove something other than its truth, it can be nevertheless [o]ffered for that purpose, and it is by the offer that [hearsay is defined]."). The State concedes this point, admitting that, "had the [officers'] testimony . . . been admitted as substantive evidence,

---

[1] The district court characterized Jones' Sixth Amendment claim as an "issue of state evidentiary law" governed by Indiana law. *Jones v. Finnan*, No. 09-cv-052, at 4. That characterization cannot be reconciled with *Crawford*, which made clear that the only hearsay definition relevant to Sixth Amendment analysis derives from the Constitution itself, not from the "vagaries of the rules of evidence" adopted by the states. See 541 U.S. at 61. See, *infra*, note 4.

*Crawford*'s requirement of adversarial testing would have been violated." Undoubtedly, the purpose for which Lewis' statement was put before the jury is generally a question of fact, not law. See, *e.g.*, *United States v. Rea*, 621 F.3d 595, 604 (7th Cir. 2010) (applying clear error standard when reviewing factual predicates to district court's hearsay ruling). We are therefore bound by the state courts' conclusion that Lewis' statement was offered not for its truth, but for a permissible non-hearsay purpose, *Jones I*, No. 45A03-0407-CR-339, at 10-11, unless there is clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).[2]

The record of Jones' trial shows beyond reasonable dispute that the Lewis statement was offered for the purpose of showing its truth, and that the trial court actually allowed its use to prove its truth. Time and again, the prosecution admitted that it wanted "to get into" the statement to show that "other independent evidence" linked Jones to the killings. Tr. 590. In contesting Jones' motion to strike Detective Davis' testimony regarding Lewis' statement, for example, the prosecution argued that,

---

[2]  We are not suggesting that a court should engage in a purely subjective inquiry into the prosecutor's motives, such that a prosecutor could be called as a witness at an evidentiary hearing to testify as to the "real" reasons for offering an out-of-court statement into evidence. We mean only that the inquiry is an objective one, based on all of the circumstances attendant to the offer of a particular statement into evidence—*i.e.*, the prosecutor's statements in open court, the actual use to which that statement was put at trial, etc.

because Jones had argued that there was "no evidence linking [him] to this case except for Lenzo Aaron," it was entitled to show that "there was independent evidence that said that [Jones] was in that apartment with [Aaron and Parks]. And that information came from . . . Jeffrey Lewis." Tr. 1132-33. Later, in regard to that same motion, the prosecution claimed that, because Lewis had provided his hearsay tip against Jones, "the jury cannot be left with [the] impression" that "the only evidence against Antonio Jones . . . came from Lenzo Aaron." Tr. 1268. "[Jones] said that there was no evidence that linked [him] to that crime scene other than Lenzo Aaron. . . . And now we should be allowed to defend ourselves because the impression that [Jones] has left this jury with is not the correct impression." Tr. 1270. By asserting it was using Lewis' statement to serve as "independent evidence" of Jones' guilt, the prosecution effectively admitted that Lewis' statement was inadmissible hearsay being offered to prove the truth of the matters asserted. See, *e.g.*, *United States v. Harris*, 542 F.2d 1283, 1300 (7th Cir. 1976) (noting that the hearsay rule "precludes the introduction of out of court statements made by one person as evidence against another"). That admission belies any contention that Lewis' statement was used purely for a permissible collateral purpose.

As if that were not enough, the prosecution was allowed to go to some lengths to convince the jury that Lewis was a credible source of evidence. During its direct examination of Detective Jackson, for example, the prosecution asked whether Lewis had requested any reward for his informa-

tion.[3] He had not. He had come forward, he had told the police, because of "what happened to the little baby." Tr. 1395. On redirect, the prosecution went on to ask questions designed to show that Lewis' statement was credible because it was consistent with Aaron's trial testimony, Tr. 1446, and because it contained information about the shootings that had never been released to the public. Tr. 1449. During its closing argument, the prosecution reminded the jury that Lewis' statement could be believed because he had "said from the beginning, it's not about the money. It's about the baby. That's what it's about." Tr. 1954.

The prosecution thought it imperative for the jury to find that the absent Lewis was credible. But why did Lewis' credibility matter if his statement was, as the prosecution insisted, offered only to show that the initial information about the case came not from Aaron but from Lewis? If that really was the reason the prosecution wanted the jury to know about Lewis' statement, the only individuals whose credibility should have been at issue were Detectives Davis and Jackson. Lewis' credibility was important only if the prosecution was using his statement to prove the truth of its contents—in other words, his credibility mattered only if his statement was in fact inadmissible hearsay. See, *e.g.*, *In re Sawyer's Petition*, 229 F.2d 805, 809 (7th Cir. 1956) ("Evidence is hearsay when its probative

---

[3] The parties stipulated that a $100,000 reward for information regarding the killings was made public before Lewis came forward with his information.

force depends on the competency and credibility of some person other than the witness.") (quotation omitted); see Black's Law Dictionary 739 (8th ed. 2004) (defining hearsay as "testimony . . . dependent on the credibility of someone other than the witness").

The record of Jones' trial leaves no reasonable room for doubt. Lewis' statement was used to establish the truth of his out-of-court declarations. Jones has easily carried his burden to show that the state courts' conclusions to the contrary were erroneous, see 28 U.S.C. § 2254(e)(1), leaving us free to conclude that Lewis' statement was in fact hearsay as the Supreme Court defined that term in *Crawford*. See 541 U.S. at 59 n.9. Because Lewis' statement was hearsay, because that statement was testimonial in nature, and because Jones never had the opportunity to cross-examine Lewis or Parks, Detectives Davis' and Jackson's extensive testimony regarding that statement violated Jones' Sixth Amendment right to confront Lewis and Parks. See *Crawford*, 541 U.S. at 68.

V. *Unreasonable Application of Clearly Established Federal Law*

Jones has met his threshold burden to show a violation of his constitutional rights. 28 U.S.C. § 2254(a). We may not grant habeas relief, however, unless that violation resulted from the state courts' "unreasonable applica-tion" of "clearly established Federal law" to Jones' claim. 28 U.S.C. § 2254(d)(1). We focus here on the decision of the Indiana Court of Appeals. See *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006) ("The relevant state court decision is that of the last state court to address the claim on

the merits."). Our next step under AEDPA, then, is to determine whether Jones' right to confront Lewis or Parks was "clearly established" under the circumstances. See *Schaff v. Snyder*, 190 F.3d 513, 522 (7th Cir. 1999) (quotation omitted).

A right is "clearly established" if that right was set forth in the "holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); see *Yancey v. Gilmore*, 113 F.3d 104, 106 (7th Cir. 1997) (noting that circuit courts of appeal may not rely on rights established solely by their own precedent to meet this preliminary requirement). Under this standard, the constitutional right at issue here was clearly established for purposes of AEDPA. The Supreme Court decided *Crawford* just a few months before Jones' trial.

A. *Crawford's Clear Prohibition*

An unreasonable application of federal law is different from a merely incorrect application of federal law. See *Williams*, 529 U.S. at 410. Generally, a state court unreasonably misapplies controlling Supreme Court precedent when it "identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. An unreasonable application of Supreme Court precedent may also occur when a state court unreasonably refuses to extend a governing legal principle to a context in which it should have controlled, *Ramdass v. Angelone*, 530 U.S.

156, 166 (2000) (plurality), or unreasonably extends a principle to a situation in which it should *not* have controlled, see *Williams*, 529 U.S. at 408 (noting that latter formulation "may perhaps be correct"). In applying this formulation of the "unreasonable application" standard, a court should be mindful of the Supreme Court's warning that this formulation has "problems of precision" that may make it difficult to apply. *Williams*, 529 U.S. at 408. We must consider "whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; see *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

Here, the state court of appeals correctly identified the governing legal rules in *Crawford* but unreasonably applied those rules to the facts of Jones' case. The state court applied a "course of investigation" exception to Jones' case so excessively broad as to allow the admission of testimonial hearsay whenever a defendant attempts to challenge the strength of the evidence or the veracity of the prosecution's witnesses against him. In doing so, the state court of appeals also failed to follow the limitations that *Bruton v. United States*, 391 U.S. 123 (1968), and *Tennessee v. Street*, 471 U.S. 409 (1985), place on the admissibility of statements such as Lewis', the substance of which was Parks' confession of his own involvement in the murders, a confession that also directly implicated Jones in the crimes.

### 1. *The "Course of Investigation" Exception*

In an attempt to justify the state appellate court's treatment of the Lewis statement, the State notes our decisions holding that an informant's out-of-court statement to law enforcement is not hearsay if that statement is offered into evidence "as an explanation of why the [subsequent] investigation proceeded as it did." *E.g.*, *United States v. Eberhart*, 434 F.3d 935, 939 (7th Cir. 2009). Applying this exception, we have rejected Sixth Amendment claims premised on such statements on the grounds that non-hearsay use of such statements does not violate the Confrontation Clause. See *id.*; *United States v. Akinrinade*, 61 F.3d 1279, 1283 (7th Cir. 1995). From these decisions, the State argues, the state appellate court could reasonably (if erroneously) have inferred that the introduction of Lewis' statement into evidence to show the course of the investigation did not violate Jones' Confrontation Clause rights.[4]

---

[4] In an attempt to preclude meaningful analysis of this issue, the State argues that there is no "rule binding upon states in interpreting their own rules of evidence in determining whether . . . statements are or are not hearsay" for purposes of the Sixth Amendment. In other words, the State argues that if it adopted a rule narrowly defining hearsay—for example, by excluding certain crimes from the hearsay rule as a matter of public policy—the Confrontation Clause would not apply to any out-of-court statements admitted under that rule because they are not hearsay under state law. Cf. *State v. Moua Her*, 750 N.W.2d 258 (Minn. 2008) (adopting a short-lived "murder exception" to the Confrontation Clause), vacated and remanded,

(continued...)

In making this argument, the State "has displayed so egregious a misunderstanding" of our cases "that the subject requires some explanation." *United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994) (reversing convictions after district court allowed hearsay confessions implicating defendants on trial). Although an out-of-court statement offered to show the reason a police investigation proceeded as it did "could be said not to be [inadmissible] hearsay," the "reasons for [an] investigation [are] most assuredly not something the Government [has] to prove to carry its burden" of proof in a criminal trial. *Mancillas*, 580 F.2d at 1309-10. Aside from those limited details necessary to show "that the evidence [found] is actually relevant," *United States v. Tanner*, 628 F.3d 890, 903 n.5 (7th Cir. 2010), the details of an investigation are generally "of only minimal consequence to the determination of the action." *Mancillas*, 580 F.2d at 1310 (quotation marks omitted); see

---

[4] (...continued)

*Moua Her v. Minnesota*, 129 S. Ct. 929 (2009). Not only would this run directly counter to *Crawford*, which made clear that the Sixth Amendment is not constrained by the "vagaries of the rules of evidence" adopted by the states, see 541 U.S. at 61, but it would also effectively nullify the Confrontation Clause in the state courts, see *id.* at 51 ("Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices."). In other words, whether a statement is hearsay for purposes of the Confrontation Clause is a matter of federal law, not a matter of state evidentiary law. It is only sensible then, that we look to our own interpretation of the "course of investigation" rule to resolve the issues in this case.

*United States v. Linwood*, 142 F.3d 418, 426 (7th Cir. 1998) (questioning relevance of such testimony); *Reyes*, 18 F.3d at 71 (noting that the "history of [an] investigation" is a useful narrative device, but is "not relevant to the guilt or innocence of the defendant"); *Teague v. State*, 314 S.E.2d 910, 912 (Ga. 1984) ("At heart, a criminal prosecution is designed to find the truth of what a defendant did and, on occasion, of why he did it. It is most unusual that a prosecution will properly concern itself with *why* an investigating officer did something."); 2 McCormick on Evidence § 249 (6th ed.) ("The need for this evidence is slight . . . .").

By the same token, the probative value of a tip on which an investigation was based is "marginal, at best," absent perhaps a (relevant) allegation of police impropriety. *United States v. Lovelace*, 123 F.3d 650, 653 (7th Cir. 1997); see also *United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004) (noting in dicta that such a tip may perhaps be relevant to "dispel an accusation that the officers were officious intermeddlers staking out [a defendant] for nefarious purposes"); *Reyes*, 18 F.3d at 70 (observing that such evidence might "constitute appropriate rebuttal to initiatives launched by the defendant"). Even when the police have been accused of acting improperly, however, the relevance of law enforcement's "reasons for investigation" remains questionable. See *Mancillas*, 580 F.2d at 1310.

While such "course of investigation" evidence usually has little or no probative value, the dangers of prejudice and abuse posed by the "course of investigation" tactic are significant. More than thirty years ago, we cautioned that

the "testimonial repetition of a declarant's out-of-court charge that the defendant would engage or was engaged in specific criminality would seem to create too great a risk" of prejudice and confusion than can be "justified simply to set forth the background of the investigation." *Mancillas*, 580 F.2d at 1310. More recently, we pointed out that an unthinking, expansive application of the "course of investigation" exception would effectively undermine the Confrontation Clause: "Allowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination, would go far toward abrogating the defendant's rights under the sixth amendment and the hearsay rule." *Silva*, 380 F.3d at 1020. Consistent with these observations, then, "the use of out-of-court statements to show background has been identified as an area of 'widespread abuse.' " *United States v. Sallins*, 993 F.2d 344, 346 (3d Cir. 1993); see 2 McCormick on Evidence § 249 ("One area where abuse may be a particular problem involves statements by arresting or investigating officers regarding the reason for their presence at the scene of a crime.").

Such statements offered to show "background" or "the course of the investigation" can easily violate a core constitutional right, are easily misused, and are usually no more than minimally relevant. Courts asked to admit such statements for supposed non-hearsay purposes must be on the alert for such misuse. See *Lovelace*, 123 F.3d at 653. A trial court should not "accept without scrutiny an offering party's representation that an out-of-court statement is being introduced for a material non-hearsay purpose." *Sallins*, 993 F.2d at 346 (reversing conviction). Our col-

leagues on the Second Circuit have explained in reversing a conviction on these grounds:

> the mere identification of a relevant non-hearsay use of such evidence is insufficient to justify its admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice. The greater the likelihood of prejudice resulting from the jury's misuse of the statement, the greater the justification needed to introduce the "background" evidence for its non-hearsay uses.

*Reyes*, 18 F.3d at 70.

For this reason, the "course of investigation" exception is most readily applied to admit only those brief out-of-court statements that bridge gaps in the trial testimony that would otherwise substantially confuse or mislead the jury. See *Silva*, 380 F.3d at 1020 (noting that this exception may apply if "a jury would not otherwise understand why an investigation targeted a particular defendant"). In *Eberhart*, for example, we allowed DEA agents to testify that an informant had identified his cocaine supplier as a man known only as "E." 434 F.3d at 937. Otherwise, it would have been largely unclear why the agents had asked that informant to call "E," who turned out to be defendant Eberhart. *Id.* at 939 & 940 n.1. Similarly, in *Akinrinade*, we allowed testimony regarding an informant's unsuccessful attempt to telephone his accomplices because that testimony helped explain why that informant had been "directed . . . to place [additional] telephone calls to Nigeria and Chicago." 61 F.3d at 1283.

For such limited purposes, however, only a small amount of information is legitimately needed in all but the rarest cases. Under the "course of investigation" exception, we typically allow only the briefest out-of-court statements. See, *e.g.*, *United States v. Taylor*, 569 F.3d 742, 748 (7th Cir. 2009) (finding no plain error in admitting, without any objection, witness' statement that defendant "just took a gun across the street" to explain officers' actions); *United States v. Breland*, 356 F.3d 787, 791-92 (7th Cir. 2004) (informant's statement that "a 'black male with a bald head' [was] dealing drugs from the residence under surveillance"); *United States v. Martinez*, 939 F.2d 412, 415 (7th Cir. 1991) (government agent's statement that he "had information that 'a man' had offered to sell an informant one-half kilogram of cocaine").

A legitimate non-hearsay purpose most certainly does not open the door for law enforcement officers to "narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination." *Silva*, 380 F.3d at 1020. Nor is it necessary to put before the jury extensive "eyewitness accounts of bad acts by the defendant that the jury would not otherwise have heard." *United States v. Price*, 458 F.3d 202, 210 (3d Cir. 2006). Unless the testimony at issue "clarif[ies] noncontroversial matter without causing unfair prejudice on significant disputed matters," *Reyes*, 18 F.3d at 70, the best course of action is to exclude the evidence altogether. If some brief item is truly necessary, the court should redact a lengthy out-of-court statement to the extent needed to ensure that its actual evidentiary function is only the legitimate one for which it is being

admitted. *Price*, 458 F.3d at 210; see 2 McCormick on Evidence § 249 ("[A] statement that an officer acted 'upon information received,' or words to that effect, should be sufficient.").

Although the Indiana Court of Appeals invoked the "course of investigation" exception to reject Jones' Confrontation Clause claim, it took none of these considerations into account. Certainly, none of the incriminating substance of Lewis' statement was necessary to bridge an otherwise-inexplicable gap in the trial testimony or to prevent the jury from being confused about some material issue. See, *e.g.*, *Silva*, 380 F.3d at 1020. To whatever extent the prosecution feared that the jury would be confused if it did not know exactly why the police started investigating Jones, that fear could have been assuaged by as little as a bare-boned statement that the police acted "on information received from Jeffrey Lewis." See 2 McCormick on Evidence § 249. Yet the trial court made no effort to exclude or redact any incriminatory details of Lewis' double-hearsay statement. See *Silva*, 380 F.3d at 1020; *Price*, 458 F.3d at 210.

The Indiana Court of Appeals also failed to appreciate that, although it invoked the "course of investigation" theory, its stated reasons for allowing Lewis' statement into evidence make sense only if that statement was considered for the truth of its contents. As the appellate court majority explained, it felt that Lewis' statement was necessary to prevent the jury from believing Jones' claim that "Aaron, whose credibility was in question, was the only source of evidence against him." *Jones I*, No. 45A03-

0407-CR-339, at 9. As Chief Judge Kirsch said so well in his
dissent, the majority essentially concluded that "because
the admissible evidence against Jones was weak, and Jones'
counsel noted such fact, it was proper to admit otherwise
inadmissible evidence." *Id.* at 16. If the majority's rea-
soning were correct, Judge Kirsch continued, "any
hearsay statement to police during the course of their
investigation would be admissible whenever a defendant
makes any comment on the evidence." *Id.* at 17. For all
of these reasons, the "course of investigation" exception
could not be reasonably applied to admit the detectives'
detailed testimony about what Lewis told them he had
heard from Parks.

###### 2.   *The Sixth Amendment, Bruton, and Accomplice Hear-say*

The Indiana Court of Appeals also failed to recognize the
significant Sixth Amendment interests implicated when, as
here, the out-of-court statement offered under the "course
of investigation" exception (or for any other purported
non-hearsay purpose, for that matter) is the confession of
a non-testifying accomplice. The Supreme Court's jurispru-
dence on this subject reveals that the Sixth Amendment
imposes important limits on a court's ability to admit such
a statement even when it can be introduced for a non-
hearsay purpose.

The hearsay evidence here was very similar to the
accomplice confession in *Bruton v. United States*, 391 U.S.
123 (1968). (The difference here is that there is one extra
layer of hearsay, since Parks, who supposedly confessed to

Lewis, did not talk directly with the detectives who testified.) In *Bruton*, the Supreme Court showed just how difficult it is to offer at trial a non-testifying accomplice's confession accusing the defendant of wrongdoing. In that case, Bruton and his accomplice Evans were convicted of armed postal robbery. *Id.* at 124. At their joint trial on that charge, a postal inspector testified that Evans had confessed that he and Bruton had committed the robbery. *Id.* On appeal, the appellate court set aside Evans' conviction because his confession had been obtained without proper *Miranda* warnings, but affirmed Bruton's conviction because the trial court had "instructed the jury that although Evans' confession was competent evidence against Evans it was inadmissible hearsay against [Bruton] and therefore had to be disregarded in determining [Bruton's] guilt or innocence," *id.* at 125.[5]

_____

[5] The State argues that Jones waived any reliance on *Bruton* by failing to invoke that case in state court or in his habeas petition. In other words, while the State concedes that we may address Jones' Confrontation Clause claim, it argues that we may weigh that claim only in light of the cases Jones has previously mentioned by name. This argument is without merit. Although a constitutional claim may be considered on habeas review only if it was first fairly presented to the state courts, that rule "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Benik*, 471 F.3d 811, 814-15 (7th Cir. 2006) (citations omitted). The substance of Jones' Sixth Amendment claim has remained unchanged, though the additional support from *Bruton* is new.

The Supreme Court reversed Bruton's conviction because the introduction of Evans' confession into evidence violated Bruton's own Sixth Amendment right to confront Evans regarding the substance of that confession. The Court pointed out that Evans' confession was "legitimate evidence against Evans and . . . was properly before the jury during its deliberations." *Id.* at 127. As a result, there existed a substantial likelihood that the jury believed that Evans had "made the statements and that they were true—not just the self-incriminating portions but those implicating [Bruton] as well." *Id.* "Plainly," the Court concluded, "the introduction of Evans' confession added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since Evans did not take the stand." *Id.* at 127-28.

In reversing Bruton's conviction, the Court made clear the extraordinary dangers posed when an accomplice's confession—one directly implicating the accused in wrongdoing—is put before a jury without affording the accused an opportunity to cross-examine that accomplice. "Not only are [such] incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame to others." *Id.* at 136. That inherent unreliability "is intolerably compounded when the alleged accomplice . . . does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed." *Id. Bruton* makes clear that the protections of the Confrontation Clause are at their zenith whenever,

as is the case here, the prosecution offers into evidence a non-testifying hearsay declarant's confession that names the accused as his partner in crime.[6]

The Supreme Court's decision in *Tennessee v. Street*, 471 U.S. 409 (1985), illustrates the point and shows just how difficult it is to introduce such a confession into evidence without running afoul of the Confrontation Clause. In that case, the prosecution had relied heavily on Street's "detailed confession" as evidence that he had murdered his neighbor in the course of a robbery. *Id.* at 411. At trial, Street testified that his so-called confession was not his own, but had been derived from a written statement that alleged accomplice Peele had previously given to law enforcement. *Id.* To rebut this specific accusation, the prosecution had one of its witnesses read Peele's statement to the jury to illustrate the differences between that statement and Street's confession. *Id.* at 411-12.

In rejecting Street's claim that the testimony concerning Peele's statement had violated his constitutional right to confront Peele, the Supreme Court noted that the "*nonhearsay* aspect of Peele's confession—not to prove what happened at the murder scene but to prove what happened when [Street] confessed—raises no Confrontation Clause concerns." *Id.* at 414. (*Street* is most commonly cited for this principle. See, *e.g.*, *Crawford*, 541 U.S. at 59 n.9.) The

---

[6] The use of a non-testifying accomplice's confession against Sir Walter Raleigh in seventeenth century England set in motion the series of legal reforms eventually resulting in the Confrontation Clause itself. See *Crawford*, 541 U.S. at 44-46.

Court acknowledged that Peele's statement "could have been misused by the jury" as hearsay evidence, but the Court rejected this possibility because the jury had been "pointedly instructed by the trial court 'not to consider the truthfulness of [Peele's] statement in any way whatsoever.'" *Id.* at 414-15 (alteration in original).

This conclusion was in obvious tension with the Court's decision in *Bruton*, which *Street* distinguished on the grounds that, "unlike the situation in [that case], there were no alternatives [here] that would have both assured the integrity of the trial's truth-seeking function and eliminated the risk of the jury's improper use of evidence." *Street*, 471 U.S. at 415. In particular, the Court noted that it simply was not possible to have "edited [Peele's confession] to reduce the risk of jury misuse without detracting from the alleged purpose for which the confession was introduced." *Id.* (quotation omitted). By editing that statement, the Court noted, the trial court "would have undercut the theory of defense by creating artificial differences between [Street's] and Peele's confessions." *Id.* at 416.

*Street* teaches that the non-hearsay use of a statement generally does not implicate the protections of the Confrontation Clause, but that another person's out-of-court confession directly implicating the accused is nevertheless so inherently prejudicial that its misuse as hearsay remains a strong possibility. To negate that possibility, a court admitting such a statement should always "pointedly instruct" the jury that the confession is to be used not for its truth, but only for a non-hearsay purpose. See *id.* at 414-

15. Before admitting the confession for a non-hearsay purpose, the court must exclude or redact the confession to whatever extent it is possible to do so "without detracting from the alleged [non-hearsay] purpose for which the confession was introduced." See *id.* at 415 (quotation omitted); *Gray v. Maryland*, 523 U.S. 185, 192 (1998) ("Unless the prosecutor wishes . . . to abandon use of the confession, he must redact the confession to reduce significantly or to eliminate the special prejudice that the *Bruton* Court found."). Such exclusion or redaction, if possible, can go a long way to ensure that a confession's irrelevant or inflammatory details do not distract the jury from the narrow purpose for which it might legitimately consider that confession and to ensure that the jury will follow a limiting instruction. See *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (holding that the Confrontation Clause is not violated by the admission of a non-testifying accomplice's confession if a proper limiting instruction has been given and "the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence").

*Street* also teaches that a non-testifying accomplice's confession can be admitted only if, in light of the inherent unreliability of accomplice confessions implicating the accused, see *Bruton*, 391 U.S. at 136, the asserted non-hearsay purpose actually advances the compelling interests at the heart of the Court's analysis in that case: "the integrity of the trial's truth-seeking function" and the "accuracy of the truth-determining process." See *Street*, 471 U.S. at 415 (quotation omitted). This final consideration is easily the most important. Under the very unusual

circumstances in *Street*, the *only* way to rebut Street's (false) allegations of fabrication was to introduce the substance of the accomplice's confession that implicated Street in the murder to show the differences.

*Bruton* and *Street* help demonstrate that the Indiana Court of Appeals unreasonably applied *Crawford* to the facts of Jones' case. Lewis' statement—the recitation of a confession he purportedly received from his brother—was actually offered into evidence to prove the truth of its contents. *Bruton* makes clear that Jones' right to confront Lewis and Parks about that confession was violated by Lewis' and Parks' failure to testify at trial and to subject their testimony to the "crucible of cross-examination." *Crawford*, 541 U.S. at 61; see *United States v. Souffront*, 338 F.3d 809, 828 (7th Cir. 2003). The need for cross-examination was compelling here. The already inherent unreliability of a confession casting blame on another, see *Bruton*, 391 U.S. at 136, is only magnified when, as here, the confession is filtered through two layers of hearsay: Parks to Lewis, Lewis to Detectives Jackson and Davis, and then Jackson and Davis to the jury.

Even if Lewis' statement had actually been offered by the prosecution to prove only a collateral issue, not as direct evidence of Jones' guilt, that statement was clearly inadmissible under *Street*. First, the trial court's meager instructions to the jury were lacking. Limiting instructions were given in regard to only three specific answers by Jackson. Tr. 1334, 1353, 1390. None were given at all regarding Davis' testimony. Tr. 571- 607. Such a halfhearted effort to instruct the jury properly could not be construed as

a "pointed instruction" that the jury not consider Lewis'
statement for its truth. See *Street*, 471 U.S. at 414-15.[7]

More fundamental, unlike the trial court in *Street*, the
court here did not face a rare circumstance in which
testimony regarding the substance of Lewis' statement was
needed to preserve the integrity of the trial's truth-seeking
function. See *id.* at 415. As explained above, the reasons the
police began investigating Jones were not relevant to the
issue of Jones' guilt or innocence. Even if they were
somehow relevant, those reasons could have been ade-
quately explained by as little as a brief statement that the
officers had acted on "information received from an
informant."

The trial court simply made no effort to limit the testi-
mony about Lewis' statement to prevent the jury from
considering that statement as substantive evidence of
Jones' guilt. See *id.*; *Richardson*, 481 U.S. at 211. Rather, it
allowed the prosecution free rein to introduce as much of
Lewis' statement as it saw fit, even going so far as to give
Jones' attorney the shocking warning that, if she continued

---

[7] We find no merit in the State's claim that the fault for this
failure to instruct the jury properly rests with Jones for not
immediately suggesting a limiting instruction. The prosecution
told the trial court that it offered Lewis' statement only to show
the course of the police investigation—certainly, that was
enough to make the court aware of the necessity of a limiting
instruction. The much wider actual uses of Lewis' statement also
belie the State's claims regarding the effectiveness of the very
few limiting instructions actually given.

"asking questions that call [the police] investigation into question . . . pretty soon all of the information they arrived at . . . in the course of [that] investigation is going to end up coming in." Tr. 1434 (emphasis added).

In deeming *Crawford* inapplicable, the Indiana Court of Appeals rested its analysis on a profound misunderstanding of both the record and the "course of investigation" exception it purported to apply. As a result of that misunderstanding, the state court so broadened that exception as to effectively allow inadmissible hearsay into evidence whenever a defendant challenges the weight or credibility of the admissible evidence against him. The state court also disregarded the teachings of *Bruton*, which flatly bars the admission of accomplice confessions such as Parks' absent an opportunity for cross-examination, and of *Street*, which sharply limits the circumstances in which such a confession may be introduced into evidence for a non-hearsay purpose. The state court's failure to apply *Crawford* to the facts of this case was "so lacking in justification" as to constitute an "error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," as required for habeas relief under AEDPA. See *Harrington*, 131 S. Ct. at 786-87.

VI. *Harmless Error?*

Finally, the State argues that any violation of Jones' Sixth Amendment rights was harmless. On habeas review, a constitutional error is considered harmless unless it can be shown to have "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v.*

*Abrahamson*, 507 U.S. 619, 622 (1993), quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946); see *O'Neal v. McAninch*, 513 U.S. 432, 439 (1995) (affirming that *Kotteakos* standard applies "in its *entirety*" to harmless error analysis on habeas review). We apply this "actual prejudice" standard regardless of whether the state appellate court determined that the error was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18 (1967). *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).[8] Under *Brecht*, if a habeas court has so much as a "grave

---

[8] Technically, if the state courts have conducted their own harmless-error analysis on direct review, "the federal court must decide whether that analysis was a reasonable application of the *Chapman* standard" under AEDPA before applying the *Brecht* standard. *Johnson v. Acevedo*, 572 F.3d 398, 404 (7th Cir. 2009); see *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (per curiam) ("[H]abeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' man-ner."). As the Supreme Court has explained, however, "it certainly makes no sense to require formal application of *both* tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former." *Fry*, 551 U.S. at 120. This is because the AEDPA/*Chapman* standard is "more liberal" than the *Brecht* standard—in other words, any error sufficiently harmful to satisfy the *Brecht* "actual prejudice" standard could be deemed harmless beyond a reasonable doubt only by unreasonably applying *Chapman*. See *id.* at 119-20. Because we conclude below that the placement of Lewis' statement before the jury caused Jones "actual prejudice" under *Brecht,* the state court of appeals' application of *Chapman* harmless error analysis was clearly unreasonable as well.

doubt as to the harmlessness of [a constitutional error], it
should grant relief." *O'Neal*, 513 U.S. at 445. In conducting
this analysis, we look to "a host of factors," such as "the
importance of the witness' testimony in the prosecution's
case, whether the testimony was cumulative, the presence
or absence of evidence corroborating or contradicting the
testimony of the witness on material points, the extent of
cross-examination otherwise permitted, and, of course, the
overall strength of the prosecution's case." *Delaware v.
Van Arsdall*, 475 U.S. 673, 684 (1986).

From the outset, we have little doubt that Detectives
Davis' and Jackson's testimony regarding Lewis' statement
had a particularly "substantial and injurious effect" on the
jury's verdict. *Brecht*, 507 U.S. at 622. At its core, that
testimony was nothing but a thinly-veiled introduction of
additional, but inadmissible, evidence of Jones' guilt. As
the prosecution explained to the trial court, the detectives
would testify that:

> Jeffrey Lewis is the brother of James Parks. James
> Parks told his brother, on the 19th, what happened,
> who did what, and why they were there. Whose idea it
> was to go and what they expected to find and exactly
> what happened. Also he then tells who shot the lady
> and the baby and that there was a bullet that went
> through the lady, through the baby and through the
> couch and on the floor. Mr. Lewis was so overcome by
> his emotion after hearing what he heard from his
> brother on the 19th, just two days [after] the killings,
> that he contacted the Gary Police Department and told
> them that it was—were it not for the baby and the

> lady—that he just had to inform the police. . . . Detective Jackson takes the information, follows up with the information, it is verified. Mr. Lewis also told about Shawn Dixon purchasing the AK . . . in December. That information is verified. The detectives then followed the trail that lead them to the defendants . . . .

Tr. 1250-51. It therefore comes as no surprise that the appellate court concluded that this testimony "pointed toward [Jones'] guilt" and "had great prejudicial impact since it suggested that Jones committed the quadruple homicide." *Jones I*, No. 45A03-0407-CR-339, at 7. In fact, our only complaint with that characterization is that it understates the prejudicial impact of Lewis' statement, which essentially served as a roadmap to the prosecution's entire case against Jones:

> This is not a case in which [a defendant] seeks reversal of his convictions on the basis of one or two inconsequential pieces of hearsay, perhaps inadvertently elicited by the government. On the contrary, [this] hearsay testimony was deliberately elicited, it was extensive, and [it] graphically portrayed [the defendant] as a despicable character . . . .

*United States v. Check*, 582 F.2d 668, 683 (2d Cir. 1978). Given that Detectives Davis and Jackson conveyed to the jury "the substance, indeed, the minutiae" of Lewis' statement, it is obvious that Jones was prejudiced by the prosecution's "unabashed use" of their testimony. *Id.*

Despite this, the district court and the state appellate court both concluded that any error was harmless because " 'Detective Jackson's testimony was not the only testimony

that pointed toward [Jones'] guilt.' " *Jones v. Finnan*, No. 09-cv-052, at 4, quoting *Jones I*, No. 45A03-0407-CR-339, at 7. Both courts failed to apply the correct legal standard. Both seem to have simply imagined what the record would have shown without Lewis' statement and asked whether the remaining evidence was legally sufficient to sustain a finding of guilt. That analysis ignores the significant prejudicial effect the error can have on a jury's ability to evaluate fairly the remaining evidence. That analysis also offers prosecutors no real incentive to comply with the Constitution so long as any evidence not admitted in error is legally sufficient to sustain a conviction. For that reason, under *Brecht*, the harmless-error "inquiry cannot be merely whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error had substantial influence" in light of the entire record. *Kotteakos*, 328 U.S. at 765; *Brecht*, 507 U.S. at 638. This principle holds true under the *Chapman* analytical framework as well. See *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("The inquiry [under *Chapman*] is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.").

If the district court and the state appellate court had not overlooked this principle, they would likely have recognized Lewis' statement's substantial effect on the jury's evaluation of Aaron's credibility. There was no physical evidence—blood, ballistics evidence, DNA, etc.—or other testimony directly placing Jones at the scene of the killings. No eyewitness other than Aaron testified that Jones was

even at the scene that night. Aaron's testimony was central to the case against Jones. Jones had to convince the jury that Aaron could not be trusted.

And Aaron's credibility was indeed questionable. Aaron had agreed to testify in exchange for an extraordinarily favorable plea agreement that took off the table all four murder charges against him. Parts of Aaron's story were either arguably inconsistent with the other evidence, or inherently unbelievable, such as his claim that A.M. never cried despite the gunfire in the residence. Aaron's self-serving attempts to minimize his role in the shootings—particularly his claim that, despite bringing an AK-47 assault rifle to McClendon's apartment, he never fired a single shot—cast his credibility even further into doubt.

By allowing the jury to hear the substance of Lewis' statement (actually, the substance of Parks' purported confession to Lewis, as relayed to the detectives) to bolster Aaron's credibility, and by bolstering Lewis' own credibility (which should have been irrelevant, if his statement was offered only to explain the "course of the investigation") with his self-proclaimed motive for going to the police, the prosecution made it much more likely that the jury would resolve any doubts about Aaron's credibility in favor of a conviction. Lewis' statement and Aaron's testimony were similar in a number of significant details. Both placed Jones at a party with Aaron and Parks the night of the shooting, Tr. 1041-44, 1354-55; both described the shootings as financially-motivated, Tr. 1049, 1355-56, 1394, 1448; both said that Jones had knocked on the door of McClendon's apartment to gain entry, Tr. 1060,

1447; both said that an AK-47 had been used during the shootings, Tr 1053, 1341-42, 1445; and both said that Parks had taken the AK-47 away from Aaron while they were in the apartment. Tr. 1061, 1086, 1445-46.

The prosecution made sure that the jury was aware of these similarities. During its redirect examination of Detective Jackson, the prosecutor asked if Jackson had heard Aaron's testimony regarding "some words exchanged between [Aaron] and Parks at the time" Parks took the AK-47 from Aaron. Jackson confirmed that he had heard this testimony and informed the jury that he had received the same information from Lewis. Tr. 1446. The prosecution then tried to reinforce Lewis' credibility by eliciting testimony that his statement contained information known only to law enforcement and the people who were actually in McClendon's apartment. Tr. 1341, 1449.

"[B]y incorporating [this] hearsay into [its] testimony, the government received the benefit of having, in effect, an additional witness . . . while simultaneously insulating from cross-examination that witness, a witness [who] we can safely assume would have been subjected to a scathing, and perhaps effective cross-examination by defense counsel." *Check*, 582 F.2d at 683. Given the obvious importance of Aaron's testimony, it is simply impossible to believe that this improper use of Lewis' statement to bolster Aaron's credibility was harmless, given the lack of other direct evidence of Jones' involvement in the killings. See, *e.g.*, *United States v. Williams*, 133 F.3d 1048, 1053 (7th Cir. 1998) (holding that "actual prejudice" had been shown where government's evidence "was bolstered by inadmissible hearsay").

In a final attempt to prove that Lewis' statement was harmless, the State argues that the trial court's limiting instructions were sufficient to render any error here harmless. This argument is meritless. It is based on the clear misreading of the trial record that is evident in both the state appellate opinion and the district court opinion. Contrary to those courts' statements, the trial court made only a minimal effort to instruct the jury about the proper use of Lewis' statement. When Detective Davis was testifying, the trial court never gave a limiting instruction. See Tr. 571- 607. During Detective Jackson's testimony, the court gave a limiting instruction only three times, and each of those instructions addressed only Jackson's answers to specific questions. Tr. 1334, 1353, 1390. The court's final jury instructions made no mention of either Lewis' statement or the detectives' testimony. The few instructions that were given during Jackson's testimony were not sufficient to inform the jury that it could consider the extensive and detailed testimony regarding Lewis' statement only for a collateral purpose rather than for its truth.

And even if the court had given repeated instructions on the subject, they would not have rendered harmless such a seriously prejudicial error. As we said in *Lovelace*, a jury is unlikely to heed a limiting instruction that asks the jury to disregard a hearsay statement that is "overwhelmingly incriminating." 123 F.3d at 654; see *United States v. Ochoa-Zarate*, 540 F.3d 613, 620 (7th Cir. 2008) (stating that the presumption that a jury will follow instructions is overcome when there is an "overwhelming probability" that the jury was unable to follow that instruction). And *Bruton* makes clear that the prejudice caused by the

recitation of an accomplice's out-of-court confession implicating the accused cannot be cured by a mere jury instruction. *Bruton*, 391 U.S. at 135-36 (deeming the "powerfully incriminating extrajudicial statements of" an accomplice a circumstance in which "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure to vital to the defendant, that the practical and human limitations of the jury system cannot be ignored"); see *Gray*, 523 U.S. at 192 ("*Bruton* . . . holds that certain powerfully incriminating extrajudicial statements of a codefendant—those naming another defendant—considered as a class, are so prejudicial that limiting instructions cannot work.") (quotations omitted).

To think that any amount of instruction would enable a jury to disregard the damning substance of an out-of-court statement like the one at issue here—a lengthy statement setting forth a detailed account of an accomplice's confession implicating Jones in a particularly heinous crime—and to consider that statement only for some marginally-relevant collateral purpose simply defies human nature, particularly if the jury had any doubts about the sufficiency of the other evidence against Jones. Cf. *Jackson v. Denno*, 378 U.S. 368, 388 (1964) ("If there are lingering doubts about the sufficiency of the other evidence, does the jury unconsciously lay them to rest by resort to the confession? Will uncertainty about the sufficiency of the other evidence to prove guilt beyond a reasonable doubt actually result in acquittal . . . ?"). As Justice Cardozo once aptly said, "Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those

accusatory words would drown all weaker sounds." *Shepard v. United States*, 290 U.S. 96, 104 (1933).[9]

In sum, we conclude that the testimony regarding Lewis' statement had a substantial influence on the jury's guilty verdict, as required to grant habeas relief under *Brecht*.


VII.  *Conclusion*

Perhaps Jones is guilty of the crimes with which he has been charged. From the evidence presented at trial, that is a distinct possibility. "We may not, however, vitiate constitutional guarantees when they have the effect of allowing the guilty to go free." *Davis*, 547 U.S. at 833. In this case, the Constitution demands that Jones have an opportunity to confront Parks if his statements to Lewis, as reported to the police detectives, are to be used as evidence against Jones. The Constitution makes no exception for Jones because the prosecution's star witness was unsavory, because the prosecution's case was otherwise weak, or because Jones was accused of especially heinous crimes.

---

[9] This is perhaps best illustrated by the jury's demonstrated interest in the substance of Lewis' statement. Under Indiana procedure, the jury was allowed to ask Detective Jackson questions at trial, a number of which involved Lewis' statement. The jury asked Jackson, among other things, how much money Lewis said Jones had taken from McClendon's apartment, Tr. 1455, and whom Lewis said that Parks had told to "finish off" Laurice Jones. The jury also showed a decided interest in Lewis' credibility, asking who Lewis had received his information from and whether Lewis was friends with Aaron. Tr. 1459.

We REVERSE and REMAND this matter with instructions to the district court to grant Jones' habeas petition pursuant to 28 U.S.C. § 2254, directing the State of Indiana to release Jones within 120 days of the issuance of the mandate unless the State elects to retry Jones within that time.

3-31-11