RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0074p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____



MICHAEL ANTHONY PEAK,

        *Petitioner-Appellant,*

    *v.*

PATTI WEBB,

        *Respondent-Appellee.*

No. 09-5977

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 07-00233—John G. Heyburn II, District Judge.

Argued: November 16, 2011

Decided and Filed: March 14, 2012

Before: MERRITT, BOGGS, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Howard J.C. Nicols, SQUIRE, SANDERS & DEMPSEY (US) LLP, Cleveland, Ohio, for Appellant. Todd D. Ferguson, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Howard J.C. Nicols, Steven A. Delchin, SQUIRE, SANDERS & DEMPSEY (US) LLP, Cleveland, Ohio, for Appellant. Todd D. Ferguson, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. Michael Anthony Peak, Central City, Kentucky, pro se.

    BOGGS, J., delivered the opinion of the court, in which MERRITT, J., joined, with MERRITT, J. (p. 13), also delivering a separate concurring opinion. CLAY, J. (pp. 14–33), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

BOGGS, Circuit Judge.  Michael Peak, convicted of first-degree murder and sentenced to life in prison, petitioned the United States District Court for a writ of habeas corpus.  He argued that his Confrontation Clause rights had been violated at trial when the government played a tape recording of his co-defendant's custodial statement without affirmatively calling the co-defendant as a witness, over Peak's objection. The court denied the petition, and Peak now appeals that denial.  Though the trial court may well have violated Peak's constitutional rights when it failed to sustain his objection, we cannot say, as the Supreme Court now requires, that fairminded jurists could not disagree with our opinion when the co-defendant was in the courtroom and available to testify and be (cross-) examined.  In fact, four such fairminded justices of the Kentucky Supreme Court did disagree.  Therefore, we are compelled to **AFFIRM**.

I

In 2002, Leann Bearden, Patrick Meeks, and Michael Peak were charged with murdering, robbing, and conspiring to murder an unidentified person.  *Peak v. Kentucky*, 197 S.W.3d 536, 541 (Ky. 2006).[1]  The investigation of Peak, Meeks, and Bearden began when Bearden told Charles Mackem, a man to whom she sold cocaine, that she had been involved in a murder.  Mackem told the story to police in exchange for immunity from prosecution.

The case was notable for its lack of physical evidence or witnesses.  No blood or fingerprints were found at the scene.  The murder weapon was never found.  The only

---

[1] The victim was identified six years later as Miguel Garcia.  Until then, he was called Juan Doe or Unidentified Male, Case FA-99-09. *See* Dan Berry, *A Name and Face No One Knew, but Never Forgot*, N.Y. TIMES, Apr. 21, 2008, http://www.nytimes.com/2008/04/21/us/21land.html? pagewanted=all (describing the search for Garcia's identity).

witnesses were the three co-conspirators themselves. Of the three, only Bearden testified. Her testimony was the version of the facts primarily relied upon at trial.[2]

According to Bearden's testimony at trial, she met the victim, whom she only knew as "Mike," at a social occasion in Louisville, where they used cocaine together. At another social event, Mike told Bearden that he wanted to sell a kilo of cocaine. After learning that Mike was trying to sell a kilogram of cocaine, Peak, Meeks, and Bearden conspired to kill Mike in order to take the cocaine.[3] Peak allegedly said to Meeks, "Yeah, you get the gun and I'll do the shooting." She testified that the next night she saw Meeks give Peak a gun. Bearden testified that at that point, she worried that the men were actually planning to kill Mike.

The next night, two nights after the three had first discussed killing the victim, Bearden, Peak, and Meeks drove to a farmhouse together.[4] Meeks told Bearden to call Mike and tell him there was a buyer for the cocaine. Bearden testified that she thought Meeks also had a gun at this point, so that both men were armed. She testified that Peak told her, "When you walk in and Mike's behind you, you better get out of the way or you're going to get shot yourself." Bearden testified that when she, Meeks, and the victim arrived at the farmhouse she went inside, hoping to find a way out of the house so that she could escape. She testified that no one was right behind her, but that she believed Mike came in next, and that Meeks did not come in the house. She stated that she did not see Peak when she went into the house. She stated that she "wound up" walking into a bathroom and was trying to open a window in the bathroom when she heard two shots. She testified that she heard Peak cursing and then calling for Meeks,

---

[2]Bearden's facts were partially corroborated by the testimony of Mike Cissell, who did not participate in and was not present at the murder, but who helped Peak and Meeks move the victim's body hours after the murder was committed. Cissell, one of Peak's best friends, testified that Peak and Meeks had approached him in advance of the murder about killing a man and stealing his cocaine.

[3]Bearden seems to have known Meeks through a mutual friend when she was in graduate school. She stated she did not know Peak until the night they first discussed killing Mike. Specifically, she stated that she met Peak the night she discussed the victim with Meeks, and that she and Peak had sex later that same night.

[4]In his taped statement, which was played at trial and is the subject of this appeal, Meeks said that he used to live in the farmhouse.

yelling: "He's not dead, he's still standing, and he's coming towards me." She then left the bathroom, and ran into Peak, who said: "Get Meeks and get him in here."

Bearden further testified that when it was getting light out, hours later, Meeks came outside and told her to come in to help clean up blood. She testified that she saw blood "everywhere" but that she did not see Mike's body. Bearden testified that, when they were finished cleaning, they drove out into the country and Peak got out of the car to throw out the gun. However, Bearden stated that she did not see the gun at any point. She merely stated that Peak said: "We need to get rid of the gun."

Later in her testimony, Bearden talked about telling the police "everything" as soon as they showed her photos of Peak and Meeks at an initial questioning. She took them to where the gun had allegedly been discarded and to the farmhouse, which had been "burnt." In her testimony, Bearden verified that she had signed a deal with prosecutors that if she testified truthfully they would not seek the death penalty against her.

After direct examination of Bearden, Peak's attorney moved for severance and a mistrial, because Bearden was "wearing two hats," as she was serving as both a defendant and as a witness for the prosecution, and because she had been allowed to be in the courtroom during the prosecution's opening statement, which gave her "the benefit of hearing him characterize her testimony immediately before getting on the witness stand." Meeks also moved for severance of the trials. These motions were denied.

During cross-examination, Bearden was demonstrated to be a witness with somewhat less than sterling credibility. She agreed that she was a drug dealer. She was impeached with contradictory statements that she had made about being frightened primarily of Meeks, not of Peak. She admitted that she did not actually see the gun, when she had said initially that Meeks gave Peak the gun. She stated she never saw blood on Peak or Meeks after the killing. She also stated that she became pregnant with Peak's child and had an abortion. Finally, Bearden admitted that she had failed a polygraph exam that she took while imprisoned.

The only direct evidence establishing Peak as the shooter in this murder came from Meeks's unsworn taped confession.[5] This confession was undisputedly made to police while Meeks was in custody, after his arrest. At trial, Meeks asserted his Fifth Amendment right not to incriminate himself. Because the state wanted to play his taped interrogation, it created a redacted version to skirt the statements that would violate Meeks's right against self-incrimination. However, Meeks thought this version made him appear even more to have been the shooter. Because he did not want this redacted version to be played, Meeks waived his Fifth Amendment rights so the state could play the unredacted tape. Meeks was available to be called as a witness at trial. Peak had not had any prior opportunity to cross-examine Meeks.

Peak objected to the government's introduction of Meeks's taped confession, arguing that playing the tape without calling Meeks to the stand at the same time violated Peak's Sixth Amendment right to confront the witnesses against him. He also moved for a mistrial. His objections were overruled. In overruling his objections, the court stated that any party could now call Meeks, as his Fifth Amendment rights had been waived.

The forty-five-minute tape was then played, during the testimony of Detective Griffin of the Kentucky State Police, who had arrested Meeks. On the tape, Meeks stated that Peak was the shooter. Meeks's statement was played twice more during trial: during the government's closing argument, and, at the jury's request, during deliberations. The tape stated in relevant part:

> [Mike, Leann, and I] [w]alked in the door [of the house where the victim was killed]. Next thing I know Leanne [sic]—Tony—Tony jumped out from a doorway[,] pulled a gun[,] and Leanne screamed, ran. I heard a gunshot. I ran. We both ran outside. I heard more gun shots. I came back inside, found the individual laying on the ground face down on the ground in a pool of blood with Tony standing pretty much over top [sic] of him hollering and screaming. Then I proceeded to go back outside because I heard Leanne scream. I went outside. She was screaming,

---

[5]These tapes (there were two) were introduced at trial as Commonwealth Exhibit 53A and 53B. The tapes were transcribed in the record but were not provided for our review, so they are quoted from the record transcript.

freaking out. I go back inside. Tony's pretty much freaking out . . . over what he's done. And then . . . worried about where the drugs are. Finds the drugs. Gets in Leanne's car. Drives it past the river. Throws the gun in the river.[6]

Meeks also stated, "I didn't kill anybody" and "I thought the gun was for Tony's protection."

At the end of the trial, the jury convicted Peak of intentional murder, first-degree robbery, conspiracy to commit murder, and tampering with physical evidence. He was sentenced to life in prison without the possibility of probation or parole for twenty-five years. Meeks was convicted of wanton murder, first-degree robbery, conspiracy to commit murder, and tampering with physical evidence. He was sentenced to life in prison without the possibility of probation or parole for twenty-five years. *Peak*, 197 S.W.3d at 540. Bearden pleaded guilty to murder, robbery, and conspiracy and received a twenty-year sentence.

Peak appealed his conviction. His appeal was consolidated with Meeks's. *Ibid.* A majority of the Kentucky Supreme Court, comprised of four justices, affirmed Peak's conviction, but only a three-justice plurality joined the opinion.[7] The plurality reasoned that the Confrontation Clause does not bar a statement as long as "'the declarant is present at trial to defend or explain it.'" *Id.* at 544 (quoting *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004)). Because Peak had the opportunity to call Meeks as a witness and chose not to, the court reasoned, he "waived his right to confrontation." *Ibid.*

Three justices dissented, stating that they believed the trial court had erred in overruling objections to a "clear violation" of the Confrontation Clause, and that they would grant Peak a new trial. *Id.* at 551. The dissent relied on *Crawford*'s language that

---

[6]Meeks's statement on the tape differs dramatically from Bearden's version of the events. Meeks recalls Bearden running immediately outside; she recalled being inside the house when she heard shots fired. Meeks's version leaves out the screaming and Peak shouting that Mike was not dead yet. Meeks makes the incident sound quick, while Bearden's version had the three at the farmhouse for at least three or four hours.

[7]Justice Roach concurred only in the result.

"[w]here testimonial evidence is at issue, the Sixth Amendment demands what the common law required: *unavailability and a prior opportunity for cross-examination*." *Id.* at 550 (quoting *Crawford*, 541 U.S. at 68). Meeks's statement was undeniably testimonial, as *Crawford* explicitly held that "police interrogations" were testimonial. *Crawford*, 541 U.S. at 68. Therefore, the dissent reasoned, the trial court had allowed testimonial evidence to be presented where the declarant was both available and where there had not been a prior opportunity for Peak to cross-examine him, a violation of both *Crawford* requirements. *Peak*, 197 S.W.3d at 550. The dissent disputed the plurality's decision that Peak waived his confrontation rights. It argued that it is not the job of a criminal defendant to cure the trial court's error. *Ibid.* Calling Meeks during Peak's case-in-chief was not an adequate substitute for immediate cross-examination, the dissent reasoned—days later, there would not be the immediacy of cross-examination and the jurors would be reminded of what they had heard.

One month after the Kentucky Supreme Court opinion was published, Peak filed a petition for rehearing in the Kentucky Supreme Court. He argued that "[t]he Court's majority opinion in this case misconceives the issue and overlooks controlling law in upholding the prosecution's introduction and use of the unredacted confession of a nontestifying co-defendant." The court denied the petition for rehearing. *See Peak*, 197 S.W.3d at 536 (noting the denial in the case caption).

Peak next petitioned the United States Supreme Court for a writ of certiorari. The Court denied the petition after requesting a response on the case after conference. 549 U.S. 1283 (2007); 75 U.S.L.W. 3497 (U.S. Mar. 19, 2007 ).

Having exhausted his state-court remedies, Peak filed a petition for a writ of habeas corpus in the district court, raising the single ground that admission of his Meeks's taped statement at trial violated his rights under the Confrontation Clause.[8] The district court denied his petition but granted a certificate of appealability. The court, in noting the standards set forth by the Antiterrorism and Effective Death Penalty Act

_____

[8]Up to this point in the case history, Peak had proceeded through counsel. He filed his petition for habeas corpus pro se.

(AEDPA) of 1996,[9] determined that the decision of the Kentucky Supreme Court was not contrary to *Crawford* and its progeny, because the district court determined that "the Constitution does not actually require the prosecution to call a witness to the stand in its case-in-chief to satisfy the Confrontation Clause. Rather, the Constitution simply requires that the witness must be made available for cross-examination." The court reasoned that "Peak's ability to have called Meeks is fatal to his Confrontation Clause argument. Placing a burden on the prosecution to do more than make the witness available . . . goes beyond what the Supreme Court cases dealing with the Confrontation Clause have required."[10]

Peak appealed the district court's denial of his petition to this court. We affirm.

II

The Sixth Amendment Confrontation Clause states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. *Crawford v. Washington* held that where "testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68.

Peak's rights under the Confrontation Clause were at issue when the government played Meeks's taped statement. The Supreme Court has held that "witnesses" are those who "'bear testimony.'" *Crawford*, 541 U.S. at 51 (quoting 2 N. WEBSTER, AN

---

[9]AEDPA states in relevant part:

(d) An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence that was presented in the State court proceeding.

28 U.S.C. § 2254.

[10]In making its decision, the district court explicitly relied on a Sixth Circuit case, *Bailey v. Pitcher*, 86 F. App'x 110 (6th Cir. 2004). However, this case was decided before *Crawford* and is irrelevant in any determination of whether the Kentucky Supreme Court was contrary to clearly established federal law when the federal law in question is *Crawford*'s holding on the right of a criminal defendant to confront the witnesses against him.

AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)).  The Court held that "testimony" is defined as "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'"  *Ibid.*  Further, the Court held that "functional equivalent[s]" of in-court testimony, specifically including custodial examinations, are the core class of testimonial statements, noting further that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard."  *Id.* at 51–52; *see also id.* at 53 ("interrogations by law enforcement fall squarely within [testimonial hearsay]").  Meeks's recorded statement did fall under the Confrontation Clause—his statement was made during a custodial examination and bore witness against Peak.

Next, we must consider whether the trial court's decision to allow the government to play Meeks's recorded statement during the testimony of Detective Griffin was an error clear enough to permit relief under AEDPA.  We may only grant habeas relief to Peak if we find that the trial court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence that was presented in the State court proceeding."  28 U.S.C. § 2254(d).  The law in question must have been clearly established at the time the state-court decision became final, not after.  *See Williams v. Taylor*, 529 U.S. 362, 380 (2000) ("It is perfectly clear that AEDPA codifies *Teague* [*v. Lane*, 489 U.S. 288 (1989)] to the extent that *Teague* requires federal habeas courts to deny relief that is contingent on a rule of law not clearly established at the time the state conviction became final.").

Further, the Supreme Court has very recently made abundantly clear that the review granted by AEDPA is even more constricted than AEDPA's plain language already suggests.  As long as "fairminded jurists could disagree on the correctness of the state court's decision," then relief is precluded under AEDPA.  *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (internal quotation marks omitted).  A habeas court "must determine what arguments or theories supported or . . . could have supported[] the state

court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Ibid.* Therefore, if it is possible for a fairminded jurist to believe that the state court's rationale comports with the holding in *Crawford*, then we must deny relief. This is a very high standard, which the Court freely acknowledges. *See ibid.* ("If this standard is difficult to meet, that is because it is meant to be.").

*Crawford* requires unavailability and a prior opportunity to cross-examine for the use of testimonial hearsay. *Crawford*, 541 U.S. at 68. When Meeks's statement was played at trial, Meeks was available and there has been no prior opportunity for Peak to cross-examine him. Clearly, if Peak was not "confronted" with Meeks, then playing Meeks's statement violated *Crawford*.

The crux of the issue is whether making a witness available to be called is confrontation, or whether confrontation instead requires the witness to take the stand at the very time, according to Supreme Court precedent that was clearly established when Peak's conviction became final.[11] It is an open question whether confrontation requires the witness to actually take the stand. At some points, *Crawford* seems to equate confrontation with cross-examination, which would require the state to put Meeks on the stand when the tape was played. *See, e.g.*, *Crawford*, 541 U.S. at 61 (the Clause "commands . . . that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."); *id.* at 68 (describing as a violation the admission of a testimonial statement when the petitioner "had no opportunity to *cross-examine her*") (emphasis added). Another Supreme Court case decided prior to Peak's case becoming final also implied that confrontation requires the ability to cross-examine. *See Davis v. Washington*, 547 U.S. 813, 822 n.1 (2006) ("The Framers were no more willing to

---

[11]A conviction becomes final when a petition for certiorari is denied or when the time for filing a petition for certiorari elapses. *Allen v. Hardy*, 478 U.S. 255, 258 n.1 (1986). A petition for a writ of certiorari from a state criminal judgment, when any party has filed a petition for rehearing in the state court, must be filed within 90 days after the petition for rehearing is denied. 28 U.S.C. § 2101(c) (incorporating by reference United States Supreme Court Rule 13(1), (3)). Therefore, because Peak filed a petition for rehearing and the petition was denied, he had 90 days from August 24, 2006, when his petition was denied, to file a petition for certiorari. He did not do so, and therefore, his conviction became final on November 22, 2006. *See* U.S. Sup. Ct. R. 30.

exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation.").

However, *Crawford* also contains language that suggests that confrontation requires only that the witness be made available to be called at trial, not that the witness be put on the stand for immediate cross-examination. *See Crawford*, 541 U.S. at 59 ("Testimonial statements of witnesses *absent from trial* have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine"*)* (emphasis added); *id.* at 53–54 ( "[T]he Framers would not have allowed admission of testimonial statements of a witness who did not *appear at trial* unless he was unavailable to testify.") (emphasis added). So there seems to be a question of whether confrontation demands the opportunity to cross-examine the declarant who has been called by the prosecution, or merely that the declarant is available at trial to be called and (cross-)examined. This case requires an answer to this question. The one Supreme Court case discussing this aspect of *Crawford* that was decided prior to the finality of Peak's conviction does not dispel the uncertainty. *See Davis*, 547 U.S. at 822 ("In *Crawford*, we held that [the Confrontation Clause] bars admission of testimonial statements of a witness who did not *appear at trial . . . .*") (emphasis added) (citation and internal quotation marks omitted). The Supreme Court simply had not, at the time Peak's conviction became final, clearly held that the ability to cross-examine immediately is required by the Confrontation Clause.

It is not unreasonable to believe, as did at least three justices on the Kentucky Supreme Court, as well as the trial-court judge, that confrontation only requires that a declarant be made available in the courtroom for a criminal defendant to call during his own case. It can be argued that this ability is equivalent to cross-examination. The defendant can, for example, employ leading questions in questioning a hostile witness on direct examination just as he could in cross-examination. FED. R. EVID. 611(c); *United States v. Hughes*, 308 F. App'x 882, 890 (6th Cir. 2009). More basically, the defendant has had the ability to confront the witness face-to-face, and to question the witness about the testimonial statement while the witness is under oath.

We are not convinced that the opportunity to call a witness, as opposed to the opportunity to immediately cross-examine a witness, satisfies the Confrontation Clause. However, we are convinced that there is a possibility for fairminded disagreement on the issue, and under clear, and increasingly strident,[12] Supreme Court precedent, that is all that is required to affirm.

## III

Because there is room for reasoned agreement with the conclusion of the Kentucky Supreme Court that, in the circumstances of this case, the Confrontation Clause does not require the opportunity to cross-examine as soon as an out-of-court statement is introduced, we respect the strictures of AEDPA and AFFIRM the denial of Peak's habeas petition.

---

[12]*See, e.g.*, *Greene v. Fisher*, 132 S. Ct. 38, 43–44 (2011) ("[T]he purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions . . . and not as a means of error correction.") (internal quotation marks omitted); *Bobby v. Dixon*, No. 10-1540, 132 S. Ct. 26, 27 (2011) (per curiam) ("Because it is not clear that the Ohio Supreme Court erred . . . so transparently that no fairminded jurist could agree with [its] decision, the Sixth Circuit's judgment [granting habeas relief] must be reversed."); *Harrington*, 131 S. Ct. 770, 786 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.") (internal quotation marks omitted).

---

**CONCURRENCE**

---

MERRITT, Circuit Judge, concurring.  I agree with Judge Boggs' opinion in the case on the AEDPA problem because in the recent case of *Greene v. Fisher*, 132 S. Ct. 38 (2011), a unanimous Supreme Court observed that the AEDPA standard "is difficult to meet, because the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice system, and not as a means of error correction."  (Internal quotation marks omitted.)  This interpretation of the AEDPA standard appears to grant much more deference to state decisions when we review them under AEDPA than the earlier interpretation in *Williams v. Taylor*, which was worded in terms of "unreasonable" interpretation or application and not in terms of reversing only "extreme malfunctions in the state criminal justice systems."  The Supreme Court has itself in the past commented on the obscure nature of the language of AEDPA, *Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  Court decisions have varied significantly in interpreting this unclear text between greater and lesser deference to state court decisions.  The unanimous decision in *Greene* and other recent cases have now come to an interpretation of AEDPA that gives much greater deference to state court interpretations of the federal constitution.

I also agree with Judge Boggs' suggestion on the merits of the confrontation question:  it is doubtful that a witness who appears in court ready for the defendant's examination can be said to meet the "unavailable" element of the test under the Sixth Amendment.

————————

**DISSENT**

————————

CLAY, Circuit Judge, dissenting.    Michael Peak's Sixth Amendment Confrontation Clause right was irrefutably violated when his co-conspirator's testimonial, hearsay confession accusing Peak as the triggerman and ringleader of a robbery and murder was played to the jury in lieu of the co-conspirator's live testimony. The majority holds that while Peak "may well have" suffered a constitutional violation, the Kentucky Supreme Court plurality decision ruling otherwise was not contrary to clearly established federal law. (Maj. Op. at 2.)  Contrary to the majority's holding, if the plain language of the Sixth Amendment is not clearly established federal law, then nothing is.  For this reason and the reasons that follow, I dissent.

## I.    Factual Background

In 2000, Peak was tried in Kentucky state court together with his two alleged co-conspirators, Patrick Meeks and Leann Bearden, for the 1998 robbery and murder of a drug dealer later identified as Miguel Garcia.  Peak, Meeks, and Bearden became suspects in the murder when Mike Cissell, who was facing criminal charges on an unrelated matter, sought leniency by informing the authorities that he had information as to Garcia's unsolved murder.  Cissell agreed to testify against Peak, Meeks, and Bearden in exchange for a special deal with the prosecution relating to his involvement in the crime.  Cissell admitted to helping the three dispose of Garcia's body but expressly denied assisting them in the murder.  Peak, Bearden, and Meeks all pleaded not guilty.

Prior to trial, Bearden entered into an agreement with the prosecution to withdraw the possibility of her being subjected to a death penalty sentence, in exchange for waiving her Fifth Amendment right against self-incrimination and for testifying against her alleged co-conspirators.  At trial, Bearden contended that she introduced Garcia to Peak and Meeks, and she knew of the plan to murder Garcia and rob him of a large amount of cocaine.  However, although she provided substantial assistance in

facilitating the crime, she did not anticipate that the crime would actually occur. Importantly, Bearden testified that she did not witness the murder. While she assumed that Peak killed Garcia, she admitted that she did not know whether Peak was even present when Garcia was murdered and that she saw only Meeks, and not Peak, with the firearm.

Peak and Meeks both invoked their Fifth Amendment right against self-incrimination. However, Meeks had previously submitted himself to police interrogation regarding the murder, and the interrogation was recorded. The prosecution planned to play the recorded interrogation to the jury at the trial; although containing hearsay, it could be played against Meeks as permitted by Kentucky Rule of Evidence 801A(b)(1), as a party admission.

During the recorded interrogation, Meeks admitted that he was involved in the robbery and murder and offered details related to the planning and execution of the crimes. However, he expressly denied that he shot Garcia, and instead accused Peak of being the triggerman and the ringleader of the conspiracy.

When the prosecution sought to admit into evidence Meeks' recorded interrogation, Meeks and Peak both objected. Meeks asserted that his statements were made under duress and fatigue, given that the interrogation took place in the middle of the night (between 1:26 am and 2:03am, and between 6:08am and 6:42am). Meeks also contended that the tactics used by the investigators were coercive and that the interrogation continued despite his request for an attorney. He thus argued that his statements should be excluded as unreliable since they were not made knowingly, intelligently, or voluntarily. The trial court judge rejected Meeks' argument.

After Meeks failed to prevent the admission of the interrogation, Peak argued that the recorded interrogation could not be played *in totum* against him, because many of Meeks' confessions contemporaneously shifted the blame to Peak, and the admission of these statements would violate Peak's rights under the Sixth Amendment, as interpreted by *Bruton v. United States*, 391 U.S. 123 (1968), and *Crawford v. Washington*, 541 U.S. 36 (2004). The trial court agreed with Peak that playing the recorded interrogation

would violate Peak's constitutional rights.  The trial court therefore required that the prosecution redact all portions of Meeks' recorded statement that implicated Peak, before the tape could be admitted.

In accordance with the trial court's mandate, the prosecution redacted the portions of the interrogation where Meeks accused Peak of assisting in the crime. However, Meeks objected to the redacted version of the tape, because he felt that the redacted version framed Meeks as the only person involved in the murder and thus assigned him greater culpability than he felt he deserved.  Eventually, the prosecution and Meeks struck a deal wherein the prosecution would admit and play the entire *unredacted* version of Meeks' interrogation if Meeks would waive his Fifth Amendment right against self-incrimination.  Although this would resolve Meeks' concerns, Peak reminded the trial court that the redaction had been ordered for Peak's benefit, not for Meeks, so Meeks' waiver of his Fifth Amendment right did not cure the violation of Peak's Sixth Amendment right.  Despite Peak's numerous objections and motions to exclude the unredacted statement, for a new trial, or for bifurcation of the trials, the trial court allowed admission of the unredacted interrogation implicating Peak and refused to sever the trials.

Once the unredacted interrogation was deemed admissible, the trial court permitted the prosecution to play the tape, including Meeks' statements implicating Peak, without the prosecution calling Meeks to the stand.  Although Meeks had waived his Fifth Amendment right, the prosecution never called Meeks to the stand, none of the defendants called Meeks, and Meeks decided not to testify on his own behalf, in conformity with his original plan.  Each time the tape was played, Peak continued to object to the violation of his rights under the Sixth Amendment Confrontation Clause, *Bruton*, and *Crawford*.  The trial court denied each of Peak's objections.

Meeks' recorded statements implicating Peak were played to the jury a total of three times.  The tape was first played to the jury during the prosecution's direct examination of a detective.  The prosecution played the tape a second time during its closing statement.  Finally, during jury deliberations, the jury requested to hear the

recorded statements again. The jury was brought back into the courtroom and once more listened to Meeks' confession implicating Peak. This was the only piece of evidence that the jury requested to hear or see again.

Meeks' recorded statements were crucial to the prosecution's case against Peak. First, Meeks was the only purported eyewitness to the murder, and thus he provided the sole eyewitness testimony that it was Peak, and not he, who shot Garcia. Although Bearden and Cissell gave testimony implying that Peak was the shooter, neither of them witnessed the shooting and the credibility of both was impeached throughout the trial. Second, the prosecution did not admit any physical or forensic evidence whatsoever linking the murder to Peak or Peak to the location where the events allegedly transpired. Furthermore, the versions of events offered by the witnesses differed greatly, especially between Bearden's testimony and Meeks' recorded statements.

The prosecution itself was aware that the admission of Meeks' recorded statements against Peak was the primary, if not only, means of obtaining a conviction against Peak. During its closing statement, the prosecution argued that Meeks' recorded statements against Peak were by themselves enough to convict Peak of the charged crimes. The prosecution also advised the jury that the fact that Peak did not call Meeks to the stand to question Meeks' recorded statements meant that Peak attested to the truth of the recorded statements.

Ultimately, the jury assigned the greatest culpability to Peak. It convicted Peak of intentional murder, and convicted Meeks of the lesser charge of wanton murder. Peak and Meeks received the same sentences with respect to their murder convictions: imprisonment for life, without the possibility of parole for 25 years. However, Meeks was only sentenced to ten years for conspiracy to commit murder, whereas Peak was sentenced to twenty years on that charge. They were also sentenced to 20 years for the robbery charge and 5 years for the tampering charge, with all sentences running concurrently.

Peak and Meeks appealed their convictions directly to the Kentucky Supreme Court. Among other issues, Meeks argued that his recorded interrogation should have

been excluded from evidence as unreliable because his statements therein were not made knowingly, intelligently, or voluntarily and because he requested a lawyer. The Kentucky Supreme Court rejected Meeks' arguments.

Peak appealed the violation of his Confrontation Clause right. A plurality of justices denied his appeal on that basis, finding no Confrontation Clause error and stating that even if there was an error, it was likely harmless. The dissenting justices disagreed and found an egregious violation of Peak's Confrontation Clause right. This federal habeas action ensued.

## II.     The Sixth Amendment's Confrontation Clause

### A.     The Purposes of the Confrontation Clause and Heightened *Bruton* Concerns

Our Confrontation Clause, penned under the Sixth Amendment to the United States Constitution, guarantees that accusations against a criminal defendant can be admitted at trial only once the accusers take the stand and confront the defendant. U.S. Const. amend. VI. This rule stretches back to seventeenth century English law and even to the Roman empire. *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988) ("[The Confrontation Clause] comes to us on faded parchment, with a lineage that traces back to the beginnings of Western legal culture." (internal citation and quotation marks omitted)); *see Crawford*, 541 U.S. at 43–45; *White v. Illinois*, 502 U.S. 346, 361–62 (1992) (Thomas, J., concurring); *Mattox v. United States*, 156 U.S. 237 (1895). "The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*." *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) (internal citation and quotation marks omitted). The right of a defendant to be confronted with his accuser is "not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers." *Id.* at 316 (internal citation and quotation marks omitted). The Confrontation Clause was designed to root out "the principal evil" of using "*ex parte* examinations as evidence against the accused." *Michigan v. Bryant*, 131 S. Ct. 1143, 1152 (2011) (quoting *Crawford*, 541

U.S. at 50) (internal quotation marks omitted). "The preference for live testimony . . . is because of the importance of cross-examination, 'the greatest legal engine ever invented for the discovery of truth.'" *White*, 502 U.S. at 356 (quoting *California v. Green*, 399 US. 149, 158 (1970)). Specifically, confrontation "impress[es] [the witness] with the seriousness of the matter and guard[s] against the lie by the possibility of a penalty for perjury" as well as "permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *Maryland v. Craig*, 497 U.S. 836, 845–46 (1990) (quoting *Mattox*, 156 U.S. at 242, and *Green*, 399 U.S. at 158) (internal alterations and quotation marks omitted); *see also Davis*, 415 U.S. at 316 (noting that cross examination is the "principal means by which the believability of a witness and the truth of his testimony are tested").

In the landmark case of *Bruton v. United States*, the Supreme Court held that the credibility and truth-telling concerns of the Confrontation Clause are heightened when the evidence that the prosecution seeks to admit is a testimonial, hearsay accusation against the defendant, uttered by a co-conspirator in the course of a confession. 391 U.S. at 132 (holding that "[t]his prejudice cannot be dispelled by cross-examination if the co-defendant does not take the stand" (internal citation omitted)); *see also Crawford*, 541 U.S. at 63–65 (refining the scope of the Confrontation Clause but reiterating concerns in *Bruton* related to the admission of a co-conspirator's accusation); *Lilly v. Virginia*, 527 U.S. 116, 132 (1999) ("[T]he truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination." (quoting *Lee v. Illinois*, 476 U.S. 530, 541 (1986))); *Akins v. Warren*, 362 F. App'x 508, 512 (6th Cir. 2010) ("A defendant's admissions, implicating his or her co-defendants, cannot be introduced at a joint trial unless the confessing defendant takes the stand."). The rule of "*Bruton* makes clear that the protections of the Confrontation Clause are at their zenith whenever . . . the prosecution offers into evidence a non-testifying hearsay declarant's confession that names the accused as his partner in crime." *Jones v. Basinger*, 635 F.3d 1030, 1049 (7th Cir. 2011). This is so because "when one person accuses another of a crime under

circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination." *Lilly*, 527 U.S. at 132 (quoting *Lee*, 476 U.S. at 541).

### B.     The Plain Language of the Sixth Amendment Places with the Prosecution the Burden of Calling Accusers to the Stand

#### 1.     The Confrontation Clause Grants Defendants a "Right" and Not a Mere "Privilege"

The Sixth Amendment commands:

> In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.

U.S. Const. amend. VI. The language drafted by our founding fathers and unchanged since 1791 could not be clearer. The right is conferred in the passive voice: a defendant has a right "to be confronted with" his accusers, not merely the privilege "to confront" his accusers. *See Coy*, 487 U.S. at 1017. "The Confrontation Clause . . . language, employing the passive voice, imposes a burden of production on the prosecution, not on the defense." *Thomas v. United States*, 914 A.2d 1, 16 (D.C. 2006). "The defendant's rights to be informed of the charges against him, to receive a speedy and public trial, to be tried by a jury, to be assisted by counsel, and to be confronted with adverse witnesses *are designed to restrain the prosecution by regulating the procedures by which it presents its case against the accused*." *Taylor v. Illinois*, 484 U.S. 400, 410, 410 n.14 (1988) (emphasis added, internal citation omitted) (comparing this with the Compulsory Process Clause, which, "on the other hand[,] . . . operates exclusively at the defendant's initiative and provides him with affirmative aid in presenting his defense"); *see Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2718 (2011) (holding that the prosecution bears the burden to preserve a defendant's Confrontation Clause rights).

Because a defendant has the right to be confronted with his accusers, the prosecution consequently has the burden to confront the defendant. This requires that the prosecution subpoena the witness, that the prosecution put that accusing witness on the stand, and that the witness actually testify. It is not the defendant's obligation to

present the prosecution's witnesses or to cure the prosecution's errors. *Bullcoming*, 131 S. Ct. at 2718; *Taylor*, 484 U.S. at 410.  Recently, the Supreme Court affirmed this basic premise in *Melendez-Diaz v. Massachusetts*, reiterating that the Confrontation Clause requires the prosecution to subpoena an available affiant if it chooses to introduce that affiant's *ex parte* testimonial statement against a defendant.  129 S. Ct. 2527, 2533, 2542 (2009).  Although the defendant also could have subpoenaed the affiant, the Court held that the defendant did not carry that burden:

> Converting the prosecution's duty under the Confrontation Clause into the defendant's privilege under state law of the Compulsory Process Clause shifts the consequences of adverse-witness no-shows from the State to the accused.  More fundamentally, the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court.

*Id.* at 2540.  I find no compelling distinction between the present case and *Melendez-Diaz*.  Bringing the witness to the courthouse would mean little if the witness was not also obliged to take the stand, just as putting the witness on the stand means little if the witness lawfully invokes a right or privilege not to testify.

While *Melendez-Diaz* post-dated the Kentucky Supreme Court decision at issue here, it did not provide a new or novel interpretation of the Confrontation Clause.  *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) (citing *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003)) (explaining that the reasonableness of a state court decision is to be measured only against rules that existed at the time the decision was issued).  Instead, *Melendez-Diaz* performed a "rather straightforward application of [the] holding in *Crawford*" and merely confirms the plain language of the Sixth Amendment and its undisturbed interpretation by the Supreme Court.  129 S. Ct. at 2533.  It has always been clear that the Sixth Amendment is not satisfied where the prosecution presents its evidence via *ex parte* testimonials and waits for the defendant to subpoena the witness (as in *Melendez-Diaz*) or to call the witness to the stand (as is the case here).  The Confrontation Clause requires that the prosecution call its available witnesses to the stand to face the defendant, rather than simply making its witnesses available for the defendant to call.

## 2.        The *Crawford* Exception

Our Supreme Court has heretofore held that where the prosecution does not put an accuser on the stand to directly accuse the defendant, it may admit a testimonial, hearsay accusation against the defendant under only one exception: where the declarant is unavailable, but the defendant has had a prior opportunity to cross-examine the declarant with regard to the accusation. *See Bryant*, 131 S. Ct. at 1153 ("We therefore limited the Confrontation Clause's reach to testimonial statements and held that in order for testimonial evidence to be admissible, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." (internal quotation marks and citation omitted)); *Crawford*, 541 U.S. at 59.

The Supreme Court has never held that the prosecution may admit a testimonial, hearsay accusation against the defendant if the declarant is seated in a pew in the back of the courtroom, but is allegedly willing to testify. The Supreme Court has similarly never held that a defendant waives his Confrontation Clause right if he fails to call an available accuser to the stand and cure the prosecution's violation of his Confrontation Clause right. There is but one way for the prosecution to admit into evidence a testimonial, hearsay accusation against a defendant: establish unavailability of the declarant and show that the defendant had a prior opportunity to cross-examine that witness.

Moreover, if the defendant does not have the burden to bring the prosecution's witnesses to the stand, the defendant cannot be deemed to have waived his rights for failing to do so. The defendant does not have the duty to cure the prosecution's Confrontation Clause errors. Importantly, a defendant is deemed to have waived his Confrontation Clause right by pleading guilty, stipulating to the admission of evidence, failing to preserve error, or procuring the unavailability of a witness. *See Illinois v. Allen*, 397 U.S. 337, 342–43 (1970); *Boykin v. Alabama*, 395 U.S. 238, 243 (1969); *United States v. Chun Ya Cheung*, 350 F. App'x 19, 21–22 (6th Cir. 2009); *United States v. Johnson*, 440 F. 3d 832, 845–46 (6th Cir. 2006). If a defendant must call the prosecution's witness, he would be faced with a "catch-22," wherein he waives his

Confrontation Clause right if he fails to call the prosecution's witness, but he also waives his Confrontation Clause right if he calls the witness.

### 3.     Constitutional Prerequisites Support the Plain Language of the Confrontation Clause

As a matter of policy, if we permit the prosecution to introduce accusations merely by having potential witnesses present in the courtroom rather than by producing them as actual witnesses for purposes of confrontation, the prosecution has only to gain and the defendant has only to lose. In such a situation, a defendant will be forced to make a choice. On one hand, he could call the prosecution's witness as a hostile witness and be permitted to ask leading questions, but he would not have had the opportunity to immediately cross-examine the witness following the prosecution's introduction of the accusation,[1] and he would risk the possibility of eliciting unfavorable testimony that would not otherwise have been presented. In the alternative, the defendant could decide to avoid these risks by not calling the witness and forgoing the opportunity to question him altogether. In many instances, the defendant will find that calling the witness is not worth the risk, as Peak did.

Under the prosecution's approach, the prosecution is provided with an overwhelming advantage. If the defendant calls the witness, the prosecution avoids its responsibility under the Confrontation Clause of producing the witness by putting him on the stand and is alleviated of its burden to provide direct examination. However, if the defendant chooses not to call the witness, only the version of the facts that the prosecution finds helpful to its case is introduced; there is no compliance with the requirements of the Confrontation Clause, and the prosecution avoids the possibility that the witness will be effectively cross-examined or change his story in response to cross-

---

[1]If the witness is called by the prosecution and the defendant's cross-examination followed, the testimony would be presented with some immediacy, satisfying the Confrontation Clause requirement. *See Davis*, 415 U.S. at 316 (holding that the Confrontation Clause requires "cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers" (internal citation and quotation marks omitted)). The majority states that there is no requirement that the ability to cross-examine be immediate, (*see* Maj. Op. at 11); however, it is notable that the majority has not cited any legal authority to support that contention.

examination, and thereby jeopardize the prosecution's case. The prosecution also avoids the responsibility of being the proponent of the witness' testimony.

Indeed, in this case, the prosecution likely did not call Meeks to the stand because Meeks disputed the reliability and veracity of his recorded admissions and accusations and would likely discredit the prosecution's evidence. By purporting to resolve the Confrontation Clause violation against Peak by merely requiring Meeks to waive his Fifth Amendment right but not put him on the stand, the trial court permitted the prosecution to introduce all of the testimonial, hearsay evidence that it hoped to admit but avoid the introduction of any contradictory evidence. The prosecution should not be permitted to resort to such opportunistic manipulation. "The Confrontation Clause may make the prosecution of criminals more burdensome, but that is equally true of the right to trial by jury and the privilege against self-incrimination." *Melendez-Diaz*, 129 S. Ct. at 2540.

### 4.        Right Against Self-Incrimination

A defendant's Fifth Amendment right against self-incrimination may also be implicated by the defendant being forced to call a witness who is expected to incriminate the defendant in order for the defendant to avail himself of his Confrontation Clause right. Because the defendant would be the party calling the witness, the defendant could easily be placed in the untenable position, in front of the jury, of appearing to be the proponent of the witness' testimony which ends up incriminating the defendant. *United States v. Hubbell*, 530 U.S. 27, 36–38 (2000) (discussing right against self-incrimination); *Schmerber v. California*, 384 U.S. 757, 761 (1966). Neither the right against self-incrimination nor the Confrontation Clause right is subordinate to the other—such that a defendant can be forced to relinquish one right in order to assert the other. *See Simmons v. United States*, 390 U.S. 377, 394 (finding a defendant's compelled election between his Fourth and Fifth Amendment rights to be "intolerable"); *see also McGautha v. California*, 402 U.S. 183, 213 (1971) (holding that "the threshold question is whether compelling the election [between constitutional rights] impairs to an appreciable extent any of the policies behind the rights involved").

**III.      AEDPA and the Kentucky Plurality Decision**

**A.        AEDPA, Generally**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, permits us to grant habeas relief only where a state court judgment "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is contrary to clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 412–13. An unreasonable application of clearly established federal law occurs where "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). We ask whether "fairminded jurists could disagree" as to the decision. *Harrington*, 131 S. Ct. 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). We are reminded that an unreasonable application of law is different from an incorrect application of law. *Williams*, 529 U.S. at 410; *Harrington*, 131 S. Ct. 785.

**B.        Habeas Relief Under AEDPA is Warranted in Peak's Case**

Peak's Confrontation Clause right was unquestionably violated. At Peak's trial, the prosecution admitted into evidence over Peak's objection—and played three times—his non-testifying, co-conspirator's testimonial hearsay confession implicating Peak as the triggerman. Meeks never took the stand, and the exception in *Crawford* did not apply because Meeks was available and Peak had not had a prior opportunity to

cross-examine him. This constitutional violation is clear under the simplest, most straightforward application of the Confrontation Clause and Supreme Court jurisprudence, as outlined above. *See Lilly*, 527 U.S. at 131 ("[T]he admission of a nontestifying accomplice's confession, which shifted responsibility and implicated the defendant as the triggerman, 'plainly denie[s] the defendant the right of cross-examination secured by the Confrontation Clause.'" (quoting *Douglas v. Alabama*, 380 U.S. 415, 419 (1965)) (internal alteration omitted)).

Despite this incontrovertible violation, the Kentucky Supreme Court plurality ruled that Peak's Confrontation Clause rights were not violated. The Kentucky Supreme Court thus unreasonably applied the Sixth Amendment to Peak's case and unreasonably extended a legal principle that permits the use of testimonial hearsay when the prosecution is unable to call its witnesses to the stand, *see Crawford*, 541 U.S. at 42–43, to situations where the prosecution is able to do so but chooses not to. It also permitted the admission of a non-testifying accomplice's confession implicating Peak, contrary to the rule in *Bruton*, 391 U.S. at 132. Habeas relief is therefore warranted under the standards set forth in § 2254(d)(1), as interpreted by *Williams* and *Harrington*, and their progeny.

Also indicative of the Kentucky Supreme Court's unreasonable application of the Confrontation Clause in Peak's case is the fact that the Kentucky Supreme Court itself recently reconsidered the issue and came to the opposite conclusion. *See Coleman v. Commonwealth*, No. 2008-SC-72-MR, 2009 Ky. Unpub. LEXIS 128 (Ky. Oct. 29, 2009). The Kentucky Supreme Court majority in *Coleman* correctly held that there is a Confrontation Clause violation where the prosecution admits witnesses' untested accusations against a defendant without calling the witnesses to the stand, despite the fact that "the witnesses [are] present in the courthouse under the prosecution's subpoena" and are able and allegedly willing to testify. *Id.* at *10–11. The Kentucky Supreme Court went so far as to hold that "[t]he only possible conclusion" in this situation is that the defendant's "[Confrontation Clause] rights were violated." *Id.* at *12. While the fact that the relevant *Coleman* and *Peak* factual scenarios are nearly

identical but yielded different results does not necessarily establish unreasonableness under § 2254(d)(2), it does "raise[] a red flag to possible 'extreme malfunctions in the state criminal justice system.'" *Rice v. White*, 660 F.3d 242, 255 (6th Cir. 2011).

Finally, one of our sister circuits recently applied *Crawford* to a habeas claim nearly identical to Peak's claim. *See Jones v. Basinger*, 635 F.3d 1030, 1041 (7th Cir. 2011). In *Jones*, during a defendant's trial for robbery and murder, the prosecution admitted a testimonial, hearsay accusation of a declarant who had been subpoenaed by the prosecution and was available to testify, without calling that witness to the stand. *Id.* The court found "no reasonable room for doubt" that the Confrontation Clause was violated by this conduct and that habeas relief was warranted due to the state court's clear error, "beyond any possibility for fairminded disagreement," in permitting such a violation. *Id.* at 1043, 1052.

In sum, the Kentucky Supreme Court plurality was objectively unreasonable in its application of the Sixth Amendment, and its decision was contrary to clearly established federal law.

### C.        Specific Problems with the Majority's Acceptance of the Kentucky Supreme Court Plurality's Decision

Despite the centuries old rule that the prosecution must put its witnesses on the stand, the majority here suggests that it was not unreasonable for a Kentucky Supreme Court plurality to interpret the Confrontation Clause to mean that so long as the prosecution's witnesses are sitting in a pew in the back of the courtroom and allege that they are willing to testify, the defendant's right to be confronted with his accusers is satisfied—even if the prosecution has admitted those witnesses' untested, out-of-court accusations into evidence without calling them to the stand. The majority would grant the defendant the mere privilege of calling the prosecution's witnesses to the stand, on his own initiative, rather than the right, in the language of the Sixth Amendment, "to be confronted with" those witnesses. This is in direct contradiction to the plain language of the Sixth Amendment and our Supreme Court's jurisprudence. *See* Section II, *supra*.

The majority endeavors to explain its irrational decision.  Specifically, the majority believes that the Kentucky Supreme Court plurality's decision was not unreasonable, because although "some points [of] *Crawford* seem[] to equate confrontation with cross-examination[,] . . . *Crawford* also contains language that suggests that confrontation requires only that the witness be made available to be called at trial, not that the witness be put on the stand for immediate cross-examination." (Maj. Op. at 10–11.)  This latter proposition is flatly incorrect.  Although Supreme Court jurisprudence includes language such as "appears at trial," *see Crawford*, 541 U.S. at 53–54, 59; *Davis*, 547 U.S. at 822 n.1 (drawing language from *Crawford*), this language, standing alone and as used by the majority, is ripped from its context.  The language at issue in *Crawford* is as follows: "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination," *Crawford*, 541 U.S. at 53–54, "[the English common law] conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine," *id.* at 54, and "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine," *id.* at 59.  The crucial difference between the circumstances of the present case and the holding in *Crawford* is that in each of these statements, the Supreme Court frames the *Crawford* test as applying to situations where the prosecution was unable to call the witnesses to the stand, not situations where the prosecution was able to call the witness to the stand but simply chose not to, as in the instant case.

Furthermore, as discussed above, the plain meaning of "appear at trial," in the Confrontation Clause context, must mean that the accusers are brought to the stand by the prosecution and not merely that they are in the courtroom.  For a witness to be in the courtroom but not testify—or for a witness take the stand but refuse to testify—would render meaningless the design of the Confrontation Clause to prevent the evils of the use of *ex parte* examinations against the defendant. *Bryant*, 131 S. Ct. 1152.  It would fail to address the need for the witness to be sworn in and impressed with the seriousness of

the matter, the defendant's cross-examination, and the jury's ability to decide the witness' credibility first-hand. *Green*, 399 U.S. at 158; *Craig*, 497 U.S. at 845–46. Moreover, the defendant cannot be required to cure the prosecution's error of failing to call the witness to the stand by the defendant calling the witness as a hostile witness and asking leading questions, because the Supreme Court has interpreted the plain language of the Confrontation Clause as providing defendant with a right and not a privilege. *Taylor*, 484 U.S. at 410.

The other allegedly problematic language in *Crawford*, which the Kentucky Supreme Court plurality explicitly relied on in making its decision, is similarly taken out of context. Footnote nine of Justice Scalia's majority opinion provides, "When the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . . The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford*, 541 U.S. at 59 n.9. That footnote was part of a discussion of scenarios where, again, a witness was actually put on the stand by the prosecution to testify, but the reliability of his testimony was at issue. Thus, the "present at trial" language did not provide a new interpretation of the Sixth Amendment that permits the admission of testimonial hearsay when the declarant is merely seated in the courtroom but not brought to the stand. The reasoning of the Kentucky Supreme Court's dissent on this matter is persuasive:

> [In that footnote], Justice Scalia was responding to concerns expressed in Chief Justice Rehnquist's dissenting opinion that the reliability of some out-of-court statements "cannot be replicated even if the declarant testifies to the same matters in court." . . . Obviously, both Justice Scalia and Chief Justice Rehnquist were assuming that the declarant would testify, but the Chief Justice believed that the prior statement might be more reliable than the in-court testimony.

*Peak v. Commonwealth of Kentucky*, 197 S.W.3d 536, 550–51 (Ky. 2006) (Cooper, J., concurring in part and dissenting in part). It was thus patently unreasonable for the Kentucky justices in the plurality to use the "present at trial" language in footnote nine to reject the plain language of the Sixth Amendment.

**IV.     The Majority and Concurrence Misread Recent Supreme Court Cases as Increasing the Level of Deference Under AEDPA**

While it is clear that Peak has demonstrated his right to habeas relief under even the strictest interpretation of AEDPA, it is also the case that the two judges in the majority here incorrectly interpreted *Harrington* and two subsequent cases, *Greene v. Fisher*, 132 S. Ct. 38 (2011), and *Bobby v. Dixon*, 132 S. Ct. 26 (2011) (per curiam), as increasing AEDPA's deference to state courts beyond that originally required by *Williams*.

In *Williams*, the Supreme Court interpreted the language of § 2254(d) and outlined an objective reasonableness standard. 529 U.S. at 409. It noted that an "unreasonable" application of federal law is different from an "incorrect" application of federal law. *Id.* at 410. As discussed *supra*, the Supreme Court in *Williams* further explained § 2254(d)(1) by defining its terms. After *Williams*, we granted habeas relief in a number of situations, finding various state courts' decisions to be objectively unreasonable because they were contrary to or involved an unreasonable application of clearly established federal law. *See, e.g.*, *Rice*, 660 F.3d at 242.

*Harrington* involved another application of AEDPA by the Supreme Court. 131 S. Ct. at 783. The *Harrington* Court cited *Williams* for the interpretation of § 2254(d) and decided that when a state court denies relief unaccompanied by explanation, the reasonableness standard in § 2254(d) still applies to habeas review. *Id.* at 785. In the course of explaining its decision, the Court further cited language that relief under AEDPA should be granted "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Id.* at 786; *see also Bobby*, 132 S. Ct. at 27 (same).

The majority interprets *Harrington*'s reference to "fairminded jurists," *see* 131 S. Ct. at 786, as setting a higher standard than the objective reasonableness standard provided in *Williams*. But the "fairminded jurists" term originates from *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004), which itself applies *Williams*' objective unreasonableness standard. 541 U.S. at 665–66. Importantly, this Court has explained,

without contradiction by the Supreme Court, that the "fairminded jurist" language is just another way of phrasing the objective unreasonableness standard. *Wiggins v. Parker*, 423 F. App'x 534, 537 (6th Cir. 2011) ("Only if the state court's decision was 'objectively unreasonable,' *Sanborn v. Parker*, 629 F.3d 554, 577 (6th Cir. 2010), only if in other words no 'fairminded jurists' could resolve the case the way the state courts did, *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011), may we grant the writ."). We have already considered and applied AEDPA following *Harrington* and have continued to apply *Williams*' objective unreasonableness standard of review and level of deference. *See Rice*, 660 F.3d at 249–51, 254. Our Circuit has not been alone in doing so. *See, e.g.*, *Jones*, 635 F.3d at 1044; *Ocampo v. Vail*, 649 F.3d 1098 (9th Cir. 2011); *Elmore v. Ozmint*, 661 F.3d 783 (4th Cir. 2011); *Guzman v. Sec'y, Dep't of Corrections*, 663 F.3d 1336 (11th Cir. 2011); *Blystone v. Horn*, 664 F.3d 397 (3rd Cir. 2011). Finally, given the number of AEDPA cases decided by the Supreme Court in recent years, it is safe to assume that had the Supreme Court sought to raise the *Williams* level of deference to be given to state court judgments, it would have said so. *See, e.g.*, *Howes v. Fields*, No. 10-680, ___ U.S. ___, slip op. at 4 (Feb. 21, 2012); *Cullen*, 131 S. Ct. at 1399; *Harrington*, 131 S. Ct. at 785; *Thaler v. Haynes*, 130 S. Ct. 1171, 1173–74 (2010); *Wood v. Allen*, 130 S. Ct. 841, 849 (2010); *Smith v. Spisak*, 130 S. Ct. 676, 681 (2010). In none of these cases does the Supreme Court state that *Williams* is overruled; indeed, in each of these decisions, *the Supreme Court continues to cite Williams' mandates* under AEDPA.

The majority's misunderstanding of the effect of *Harrington* and other recent cases affects its analysis. In erroneously interpreting *Harrington*'s "fairminded jurists" language as setting a new, higher standard for AEDPA review, the majority holds that because "four such fairminded justices of the Kentucky Supreme Court did disagree" that the Confrontation Clause was not violated, we are "compelled" to grant deference under AEDPA. (Maj. Op. at 2.) In other words, because we are to presume that the justices are fairminded, the majority reasons, we must conclude that their decisions are similarly fairminded.

The majority erroneously defers to the Kentucky Supreme Court justices' status as state court judges, rather than their legal analysis. Though the AEDPA standard is "difficult to meet," *Harrington*, 131 S. Ct. at 786, the majority's interpretation makes the standard impossible to meet, as no habeas claim would reach our Court unless a jurist presumed to be fairminded had not already once decided the issue against the defendant. Contrary to the majority's argument, the "fairminded jurist" references in *Harrington* and *Bobby* cannot be understood to suggest a subjective reasonableness test or, worse, complete deference to state court judges. The level of deference advocated by the majority subverts rather than illuminates the Supreme Court's standard inasmuch as it would essentially render the Great Writ of Habeas Corpus completely meaningless. As we recently held, "[d]espite the great deference accorded state court adjudications of federal claims, AEDPA, of course, 'stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.'" *Rice*, 660 F.3d at 251 (quoting *Harrington*, 131 S. Ct. at 786). "Federal courts retain statutory and constitutional authority, absent suspension of the writ, to remedy detentions by state authorities that violate federal law, so long as the procedural demands of AEDPA are satisfied." *Rice*, 660 F.3d at 251.

Finally, the concurrence fixates upon the "extreme malfunctions" language in *Greene*.[2] (Con. Op. at 13). That language is also offered in *Harrington* and was lifted from Justice Stevens' concurrence in *Jackson v. Virginia*, 443 U.S. 307, 322 n.5 (1979). It was already in existence in Supreme Court jurisprudence when *Williams* was decided and does not alter *Williams*' objective unreasonableness standard. *See Rice*, 660 F.3d at 251, 255. Nor does it set some new, higher standard, as the concurrence appears to suggest. In any event, the state court's interpretation of the Confrontation Clause in this case was indeed an extreme malfunction. *See Jones*, 63 F.3d at 643.

---

[2]That language reads, "We have said that [the § 2254(d)] standard of 'contrary to, or involving an unreasonable application of, clearly established Federal law' is 'difficult to meet,' because the purpose of AEDPA is to ensure that federal habeas relief functions as a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction." *Greene*, 132 S. Ct. at 43 (quoting *Harrington*, 131 S. Ct. at 786) (internal alteration and quotation marks omitted).

In conclusion, the Kentucky Supreme Court plurality's decision to uphold the admission of Meeks' *ex parte* accusation against Peak, without the prosecution calling Meeks to the stand despite its ability to do so, is both contrary to and an unreasonable application of the Sixth Amendment and Supreme Court jurisprudence, *see* 28 U.S.C. § 2254(d)(1), because our Constitution has always required the prosecution to bring accusers to the stand to face the accused. U.S. Const. amend. VI. The majority has also misread recent AEDPA jurisprudence to raise the bar for federal habeas relief to an impossible height. I would therefore reverse and grant the writ.

Given the United States Supreme Court's steadfast protection of our country's Sixth Amendment Confrontation Clause right, I am hopeful that the Supreme Court will consider this matter on petition for writ of certiorari.